58 F.3d 1547
 John M. MERRETT, Solomon Clayton, Jr., Cecelia A. Clayton,
Plaintiffs-Appellants,
v.
James T. MOORE, Commissioner, FDLE, Leonard Mellon, Exec.
Director, Florida Dept. of Highway Safety & Motor
Vehicles, Lawrence Crow, Chief, Lakeland
Police Dept., Jerald Vaughn,
Defendants-Appellees.
 No. 93-2510.
 United States Court of Appeals,
Eleventh Circuit.
 July 25, 1995.
 
 Edward W. Stafmen, Stafmen & Friedlander, Tallahassee, FL, for appellants.
 Charlie McCoy, James A. Peters, Asst. Attys. Gen., Dept. of Legal Affairs, Tallahassee, FL, for Mellon, Butterworth and Dempsey.
 John P. Booth, Charlie McCoy, Asst. Gen. Counsel, Fla Dept. of Law Enforcement, Tallahassee, FL, for Moore & Dempsey.
 Reynolds E. Pitts, Jr., Fuller, Johnson & Farrell, P.A., Pensacola, FL, Patrick J. Farrell, Robert W. Ritsch, Fuller, Johnson & Farrell, P.A., Tallahassee, FL, for Cities of Lakeland, Mailtand & Largo Police Depts., Crow, Doyle, Vaughn and Ervin.
 Appeal from the United States District Court for the Northern District of Florida.
 Before EDMONDSON and BIRCH, Circuit Judges, and HILL, Senior Circuit Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 This case requires us to consider when, consistent with the Constitution, a state may establish roadblocks for the chief purpose of locating illegal drugs. This case arose out of roadblocks that Florida law enforcement officials established along state highways. Plaintiffs brought suit under 42 U.S.C. Sec. 1983 claiming that their Fourth and Fourteenth Amendment rights were violated when their vehicles were stopped, sniffed by dogs, and in some cases, searched at these roadblocks. Because the roadblocks, as planned by defendants, were not unconstitutional, we affirm the district court's orders granting summary judgment against plaintiffs' claims.
 
 
 2
 Briefly stated, the undisputed facts of this case are as follows.[1] From 1982 through 1984, the Florida Department of Law Enforcement (FDLE) developed a series of operations intended to intercept illegal drugs on state highways. As part of the operation, FDLE officials proposed to set up temporary checkpoints along highways to stop all traffic and expose the cars to narcotic sniffing dogs. Because the FDLE has no authority to establish roadblocks, it asked for the assistance of the Florida Highway Patrol (FHP) to set up drivers' license checkpoints. FDLE officials also requested the assistance of K-9 units, each consisting of a narcotic sniffing dog and its handler, from the cities of Maitland, Lakeland, and Largo, Florida.
 
 
 3
 The joint operation plan, entitled "Interdiction of Illegal Narcotics, North Florida," called for roadblocks from 4:00 p.m. until 10:00 p.m. on January 11 and 12, 1984, at specific sites on four Florida highways near the Georgia state line. Six FHP troopers, one FHP investigator, five FDLE agents, and four or five K-9 units were assigned to each site. At a pre-operation briefing, all participants were given a copy of the Operation Plan and instructed about their respective responsibilities. The FHP troopers were responsible for traffic control and for stopping vehicles, checking obvious safety defects, and examining drivers' licenses and vehicle registrations. They were instructed to stop all traffic passing through the roadblocks until traffic became congested, in which case vehicles were to be waved through as necessary to avoid long backups.
 
 
 4
 The dog handlers were told that the outside of each car was to be sniffed by the dogs as FHP troopers checked the driver's license and vehicle registration. If a dog alerted to the presence of drugs or if license or registration problems were found, the car was directed to a location out of the flow of traffic. In the case of a dog alert, a second dog was supposed to check the outside of the car. If the second dog alerted, consent to search was requested; and, if refused, the driver was detained until a search warrant was obtained. FDLE agents worked with the dog handlers and were responsible for making decisions about vehicle searches if a dog alerted to the presence of drugs.
 
 
 5
 Other teams--each consisting of an FDLE agent, an FHP trooper, and K-9 unit--were directed to walk around vehicles parked in nearby rest areas and truck stops. If the dogs alerted, the driver was to be located and asked for consent to search.
 
 
 6
 During the operation, the Florida Department of Transportation set up traffic control devices including cones, warning signs, and flashing lights to direct motorists to the checkpoints. During the two day operation, approximately 2100 vehicles passed through the roadblocks of which roughly 1330 were stopped. With the vehicles checked by teams at the rest areas and truck stops, approximately 1450 vehicles were sniffed by the dogs. The dogs alerted to 28 vehicles; and, after a full search, only one person was arrested for possession of illegal narcotics. In addition, law enforcement officials issued sixty-one vehicle-related citations.
 
 
 7
 At the roadblocks, the actual encounter with the officers conducting the drivers' license checks lasted a few minutes. And, the dogs usually were able to sniff the exterior of the cars before the license and registration checks were completed. So, most people experienced only a slight delay. But, during rush hours, traffic backed up; and some people waited thirty to forty-five minutes before arriving at the roadblock or being waved through. In general, vehicles were permitted to leave the lines approaching the roadblocks and to turn around, but not without first being stopped by a trooper and having their registrations and drivers' licenses checked. Still, in at least one instance, a driver was instructed to remain in the line. People whose vehicles were actually searched experienced longer delays. In addition, one car overheated; one minor accident occurred; the dogs scratched several cars; and one person was bitten by a dog.
 
 
 8
 Plaintiffs, a class of motorists stopped at the roadblocks, brought suit against state and local officials involved in the operation. Plaintiffs say the checkpoints violated their Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures. Plaintiffs specifically sued defendants Robert Dempsey, the Commissioner of FDLE during the operation, and Robert Butterworth, the Director of the Florida Department of Highway Safety at the time, in their individual capacities, seeking compensatory and punitive damages. Plaintiffs also sued the police departments for the Florida cities of Lakeland, Maitland, and Largo and their Chiefs of Police for compensatory and punitive damages. In addition, plaintiffs sued the current Commissioner of FDLE, James Moore, and the current Director of the Department of Highway Safety, Fred Dickinson, in their official capacities, seeking declaratory and injunctive relief to prevent the state from conducting future roadblock operations.
 
 
 9
 The district court disposed of the case through a series of orders. First, the court dismissed the claim against the police chiefs and their city police departments on the grounds that the chiefs had not "knowingly conspired" to violate plaintiffs' rights and that the facts did not support imposing municipal liability. Next, the court addressed the merits of plaintiffs' constitutional claims and concluded that the operation, as planned, violated no constitutional rights. In a later order, the court granted defendants Butterworth and Dempsey qualified immunity on the grounds that, at the time of the roadblocks, it was not clearly established that the operation violated plaintiffs' constitutional rights. The court also dismissed the claim against Moore and Dickinson because the planned operation did not--and in the future will not--authorize unconstitutional conduct.
 
 
 10
 The district court's orders contain no reversible errors of law. Everything stated in those orders will not be restated in this opinion; instead, we write to emphasize and to clarify some points raised by this case.
 
 
 11
 At the outset, plaintiffs contend that the State of Florida conducted the roadblock operation at issue for the purpose of exposing the cars to the drug sniffing dogs. So, plaintiffs claim the operation was an invalid pretextual seizure. We disagree.[2] That the chief (but not sole) purpose of the roadblocks in this case was to intercept drugs is undisputed. That the state had the authority to conduct roadblocks to check drivers' license and vehicle registration is also undisputed. We conclude that, where the state has one lawful purpose sufficient to justify a roadblock, that the state also uses the roadblock to intercept illegal drugs does not render the roadblock unconstitutional. In other words, we adopt a totally objective rule: a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock, even if no roadblock would have been put in place but for the state's desire to hunt for unlawful drugs.[3]
 
 
 12
 Our holding that the state of Florida, in principle, has the authority to conduct some roadblocks, at which drugs are sought, does not conclude our consideration of this operation's constitutionality. Next, we must consider whether this operation--as planned or in the reality of its performance--violated plaintiffs' constitutional rights; that is, whether these roadblocks were reasonable in the light of the state's interest in conducting the roadblocks, the effectiveness of the operation in promoting that interest, and the level of intrusion on the individual's privacy caused by the checkpoints. See Brown v. Texas, 443 U.S. 47, 49-51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). At least to the extent the operation was conducted to ensure compliance with the state's driver licensing and vehicle registration laws, the operation advanced an important state interest. See Delaware v. Prouse, 440 U.S. 648, 657-58, 99 S.Ct. 1391, 1398, 59 L.Ed.2d 660 (1979).[4] And, that the operation's actual vehicle citation rate was 4.6%, significantly higher than the rates found acceptable in Martinez-Fuerte and Sitz, shows that the operation, as performed, effectively advanced the state's interest.[5]
 
 
 13
 Pursuant to the operational plan, no motorist was to be detained at the checkpoint--that is the location where the motorist encountered the officers--for longer than the time required to conduct a driver's license and registration check. The dogs were to circle the exterior of the car while the officers conducted the document inspection. So, the plan called for motorists to experience only a slight delay once they reached the checkpoint. Nothing in the record indicates that, during execution of the plan, motorists were detained at the checkpoint for longer than this anticipated delay.[6] The Supreme Court has upheld the constitutionality of brief roadblock seizures that lasted about twenty-five seconds at a sobriety checkpoint, see Sitz, 496 U.S. at 444-56, 110 S.Ct. at 2483-88, and seizures that lasted 3 to 5 minutes at an immigration checkpoint away from the border. See Martinez-Fuerte, 428 U.S. at 544-48, 96 S.Ct. at 3077-78. So, in this case, we believe the slight delay required to conduct the license check was no unreasonable delay.[7]
 
 
 14
 State planners anticipated the possibility of traffic backing up at the roadblocks; so, they instructed officers to wave cars through the checkpoints as necessary to avoid congestion. But, the record indicates that the officers on the spot did not always respond quickly to changing traffic patterns and at times did not allow traffic to pass through as instructed. During rush hour, traffic became congested; and some people waited up to 45 minutes before reaching the checkpoint or being waved through. Whether these people were "seized" while they waited to reach the checkpoint and, thus, whether their delay should be considered in assessing the reasonableness of the operation, depends on whether they reasonably believed they were not free to turn around and to avoid the checkpoint. The clock for assessing the reasonableness of the delay caused by the checkpoint begins to run when a reasonable person would believe he cannot leave the line and avoid the checkpoint. See United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Governmental officials must pay special attention to traffic back-ups at roadblocks; this circumstance carries with it the greatest potential for constitutional violations and for liability for the violations.
 
 
 15
 Nothing in the record indicates that many or most waiting drivers believed they could not leave the line. In fact, the record indicates that, in general, drivers were permitted to leave the line, but not without first being stopped by a trooper, having their license and registration checked, and perhaps having their vehicles sniffed by dogs. Assuming the resulting delay to these drivers (the ones who left the line) was no more than a few minutes--and we have no evidence to the contrary, these motorists were not seized for an unreasonable period of time.[8] But, at least one motorist was told that he could not leave the line. This motorist was seemingly seized during the entire 20 minutes he was required to remain in the line.[9] Such delay seems too long and, given the circumstances, might violate the Constitution. But, no other violations are supported by the record.[10]
 
 
 16
 Plaintiffs contend that, regardless of the constitutionality of the roadblocks by themselves, the use of dogs to sniff the exterior of their cars without an individualized reasonable suspicion of drug-related criminal activity amounted to an unconstitutional search. In United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court determined that, because a canine sniff of a person's luggage indicated only the presence or absence of contraband, the canine sniff was only minimally intrusive and was no "search" within the meaning of the Fourth Amendment. Id. at 706-09, 103 S.Ct. at 2644-45.[11] Here, the dogs sniffed the exterior of plaintiffs' vehicles; they did not invade plaintiffs' homes or their bodily integrity. The sniffs occurred while plaintiffs were lawfully stopped in a public place; and because the sniffs occurred during the license check, plaintiffs were not delayed to conduct the sniffs. The sniffs also alerted the officers only to the potential presence of drugs; they did not expose the contents of plaintiffs' vehicles to public view. (And, the privacy interest in possessing illegal drugs is not one that society recognizes as reasonable. United States v. Jacobsen, 466 U.S. 109, 121-25, 104 S.Ct. 1652, 1661-62, 80 L.Ed.2d 85 (1984).) As in Place, the external sniff of plaintiffs' vehicles was not a search within the meaning of the Fourth Amendment.[12] So long as the use of the dogs did not make the delay caused by the roadblocks unreasonable--and we have no evidence to the contrary, the state's decision to use dogs at the roadblocks does not make the operation unconstitutional.
 
 
 17
 In summary, the balance of the state's interest in enforcing its license and registration requirements, the extent to which the roadblocks furthered that interest, and the degree of intrusion on individual motorists who experienced only slight delays weigh in favor of the state program. We therefore hold that the operation, as planned, did not violate the Constitution. And, in the case of most motorists, the roadblocks were in reality conducted consistently with the Fourth and Fourteenth Amendments. But, in the limited instances of motorists who were delayed for significantly more than the brief time it took to conduct the license check and who were told they could not turn around and leave the line before reaching the roadblock, the roadblocks could constitute an unreasonable seizure.
 
 
 18
 Our conclusion that at least one motorist might have suffered constitutional deprivation does not entitle plaintiffs to relief against defendants. The supposed constitutional violation--an unreasonable delay--occurred when, in violation of the official plan, individual officers (who are not defendants here) failed to let traffic pass through the roadblocks. Defendants Dempsey and Butterworth cannot be held vicariously liable for unauthorized acts of their subordinates: the doctrine of respondeat superior is unavailable under section 1983. See Monell v. Department of Social Services, 436 U.S. 658, 691-92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).[13]
 
 
 19
 The judgment of the district court is AFFIRMED.[14]
 
 
 
 [1]
 At a motions hearing before the district court, the parties told the court that no factual disputes existed and that the case could be decided by summary judgment
 
 
 [2]
 For roving traffic patrol officers, this court has held that pretextual stops may violate the Constitution. We have said, in that context, the important question is, not whether some officer could have lawfully made the stop, but whether a reasonable officer would have made the stop in the absence of the illegitimate motive. See United States v. Smith, 799 F.2d 704, 708 (11th Cir.1986). But see United States v. Hassan El, 5 F.3d 726, 731 (4th Cir.1993) (rejecting Eleventh Circuit pretextual analysis and adopting "purely objective test" used in majority of circuits under which a stop is not invalid pretext as long as an officer could have made the stop)
 Defendants have not tried to conceal the purposes of the roadblocks. That the chief (but not sole) purpose of the roadblocks in this case was to intercept drugs is undisputed. And, the Smith pretextual analysis pressed on us by plaintiffs does not control this case because a stop at a checkpoint such as a roadblock is fundamentally different from the roving patrol stops at issue in Smith and those decisions following that case. Those cases involve field-level law enforcement acts by individual officers acting on their own discretion. Smith indicates the unconstitutional act occurs when an officer selectively targets a particular person based on the officer's subjective belief, not amounting to probable cause, that the person engaged in unlawful conduct other than a traffic violation.
 As the Supreme Court has noted, roadblocks are different from roving patrols. United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (distinguishing roving patrol stops and roadblock stops, in part, because roadblocks limit officer's discretion); Delaware v. Prouse, 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) (recognizing that roadblocks avoid "standardless and unconstrained discretion" present in individual stops). At roadblocks, the stop involves no individual discretion of officers in the field. State law enforcement decision-makers decide as a policy matter to conduct the operation. And, everyone traveling on the road at the time of the operation is stopped and subjected, at least initially, to the same investigation. So, one officer's individual discretion does not affect the determination of who is stopped. Because police officer discretion is not at the heart of the roadblock stop, no selective targeting occurs; and, the pretext analysis, as set out in our precedents, does not fit the roadblock case. We think a different rule is justified, and we will not extend those precedents to these circumstances.
 
 
 [3]
 Courts have upheld the use of roadblocks to check drivers' licenses and vehicle registrations, United States v. McFayden, 865 F.2d 1306 (D.C.Cir.1989); to prevent the entry of illegal aliens, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); and to check for drunk drivers, Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), on the grounds that each was a valid state interest. No question is presented about whether a state can lawfully conduct a roadblock solely to intercept illegal drugs; and we leave that question open
 
 
 [4]
 Plaintiffs argue that the purpose of finding illegal drugs is not related to the state's interest in highway safety. Again, the state has identified one legitimate state interest--license and registration enforcement--advanced by the operation; so, we need not consider other reasons motivating the state to conduct the operation
 
 
 [5]
 This percentage reflects the citation rate for vehicles checked at the roadblocks
 
 
 [6]
 Records of the time required to conduct the document inspection were not kept. But, statements by troopers conducting the stops, as well as a video tape of vehicles stopped at the roadblock on U.S. Highway 19, suggest that the document inspection and external sniff were often conducted in less than one minute
 
 
 [7]
 Drivers were directed to the side of the highway when a dog alerted to the presence of illegal drugs in their cars. These drivers experienced longer delays as a second dog sniffed their cars or their cars were searched or both. But, as the lower court held, an alert by a narcotics trained dog establishes probable cause to believe a car contains illegal narcotics. See United States v. Dovali-Avila, 895 F.2d 206 (5th Cir.1990). So, the additional delay suffered by these people did not violate the Constitution. The delay suffered by people cited for license and registration violations also was not unconstitutional
 
 
 [8]
 At the rest areas and truck stops, each of the cars sniffed by the dogs was parked. No moving vehicles were stopped; and in the absence of an alert by a dog, vehicle operators were not detained. So, most of the conduct of the officers at the rest areas and truck stops did not constitute a seizure
 
 
 [9]
 We note that even this person, when his car overheated, was permitted ultimately to turn around and leave the line before reaching the actual roadblock
 
 
 [10]
 The record pertaining to whether people waiting in line believed they could turn around is not extensive. Officers conducting the roadblocks said that drivers were permitted to turn around and to avoid the checkpoint after being stopped and having their drivers' licenses and vehicle registrations checked. Out of the more than 2100 vehicles to pass through the roadblock, plaintiffs provide affidavits of only two drivers who attempted to turn around. And, both of these drivers were permitted to leave the line before reaching the checkpoint. One was allowed to leave after being stopped and questioned; and the other, although originally told to remain in the line, was permitted to leave when he experienced car trouble. Plaintiffs provide no affidavits of drivers who wanted to turn around but believed they were required to remain in the line and, therefore, remained in line until they reached the checkpoint
 In addition, plaintiffs claim that the presence of a trooper in a "chase" car stationed behind the cars approaching the roadblock suggests that a reasonable person would not believe he could turn around. But, we think this circumstance is not probative. The presence of the chase car just as likely assures motorists that they can expedite their confrontation with law enforcement by turning around: a person waiting in line would know that he, without waiting to reach the roadblock, could talk to a police officer quickly if he needed or wanted to do so. And, the record indicates that the chase car is stationed by police at the back of the line because, in the light of their past experience, turn arounds are very common and expected at roadblocks. This practice and experience suggest that people waiting at roadblocks believe they are free to turn around.
 Plaintiffs also claim that a reasonable person would not believe he was free to turn around for fear he could be prosecuted under Florida Statute section 316.1935. But, that statute makes it a crime for a person to evade or elude a police officer after having been ordered to stop. By its terms, the statute, to say the least, does not plainly apply to the line of traffic not yet at the roadblock; and no reported cases suggest that a motorist would violate Florida law by attempting to turn around before reaching the roadblock. Nothing in the record indicates that the State of Florida has a practice of prosecuting drivers under this statute for turning around at roadblocks. And, plaintiffs present the affidavits of no drivers who wanted to turn around but say they did not do so for fear of prosecution under the statute.
 Also, nothing in the record suggests that the physical terrain prevented motorists from turning around. In fact, the record indicates that the highway medians in the areas of the roadblocks were flat and dry, thus, facilitating attempts to turn around.
 In district court, plaintiffs stated that the record was sufficient to decide their claims on summary judgment. But, plaintiffs have failed to produce the kind of evidence in the record which would permit a fact finder to find that a reasonable person would believe he was not free to turn around.
 
 
 [11]
 Plaintiffs argue that the Court's holding in Place should be limited to sniffs of unattended property and that this court should follow the reasoning of the Second Circuit in United States v. Thomas, 757 F.2d 1359 (2d Cir.1985), which held that a dog sniff outside a person's apartment was a search requiring Fourth Amendment protection. Id. at 1367
 We reject plaintiffs' claim. A person's privacy interest in his automobile on a public road is less than a person's privacy interest in his residence. The use of the dogs on the exterior of the cars constitutes no search. See United States v. Seals, 987 F.2d 1102, 1106 (5th Cir.1993) (sniff of vehicles exterior no search); United States v. Morales-Zamora, 914 F.2d 200, 205 (10th Cir.1990) (same); United States v. Rodriguez-Morales, 929 F.2d 780, 788 (1st Cir.1991) (same).
 
 
 [12]
 In a similar way, the rest areas are public places; and the truck stops, although private, were checked with the consent of a manager. So, the use of the dogs on the exterior of cars parked at these places did not constitute a search
 
 
 [13]
 And, because the operation violated no clearly established law, Dempsey and Butterworth are entitled to qualified immunity in their individual capacities. Lassiter v. Alabama A & M University, 28 F.3d 1146 (11th Cir.1994)
 
 
 [14]
 Plaintiffs also seek prospective relief against defendants Moore and Dickinson to prevent the use of similar roadblocks in the future. Because the roadblock plan is not unconstitutional on its face, plaintiffs lack standing to bring a claim for prospective relief. See Kerr v. West Palm Beach, 875 F.2d 1546, 1553-54 (11th Cir.1989)
 The city police chiefs' mere acquiescence in what appeared to be a legitimate state act is insufficient to find that they conspired to establish the roadblocks. See Fonda v. Gray, 707 F.2d 435, 438 (9th Cir.1983). And, because no city officials made specific choices about a course of conduct during the operation, municipal liability cannot be imposed on the city defendants. See Pembaur v. Cincinnati, 475 U.S. 469, 480-84, 106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452 (1988).