PER CURIAM.
Appellant Phillip Campbell entered a plea of no contest to drug possession charges, reserving the right to appeal denial of his dispositive motion to suppress evidence. The question before us is whether a “police traffic safety stop” operated by the Jacksonville Sheriffs Office violated appellant’s Fourth Amendment right to be free of unreasonable searches and seizures. Because the procedure in question satisfied both the balancing test established by the United States Supreme Court and the specific requirements of the Florida Supreme Court for this type of case, we affirm appellant’s conviction.
Campbell was stopped on Friday, May 7, 1993 around 6:00 p.m. at a “police traffic safety stop” by officers of the Jacksonville Sheriffs Office. After an officer discovered that Campbell had a suspended license, Campbell was transported to the county jail where officers searched him and found powder cocaine and marijuana in his sock. Campbell contends that the order denying his motion to suppress must be reversed because the police roadblock constituted an unlawful seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution.
The Jacksonville Sheriffs Office set up a roadblock to check for traffic and safety violations by motorists. The roadblock was established in response to area residents’ complaints about speeding and a severe accident with serious injuries that had occurred the previous weekend as a result of speeding and possibly faulty equipment. The roadblock was set up on a three-quarter mile segment of a two-lane road between two curves in the 11800 block of Mandarin Road, a residential area. The sheriffs office conducted the roadblock for five horns, during which time 92 citations were issued including 49 speeding tickets, 9 misdemeanor traffic arrests and the single felony drug arrest involved in this ease. Radar units were used at both ends of the roadblock.
At the time of Campbell’s arrest, the Jacksonville Sheriffs Office had in force Operational Order 12.1.1(iv)(B) requiring certain procedures for a “safety check deployment”:
B. In the event a safety check deployment is utilized, the following procedures shall apply:
1. The supervisor of the proposed operation shall initiate a Directed Patrol Worksheet (P-883), showing themselves as the tactical leader of said operation; and
2. The supervisor completing the Directed Patrol Worksheet should be aware that the safety check deployment must be conducted in such a manner as to eliminate the discretion of the officers in the field. Thus, the Directed Patrol Worksheet should contain the following guidelines in the “Description of Strategy” section in an effort to accomplish this:
a. Procedures regarding the selection of vehicles (i.e., officers will check every third vehicle or every fifth vehicle, etc.);
b. Detention Techniques — Officers shall have the driver pull over, out of traffic for safety reasons and conduct the appropriate investigation; and
e. Duty Assignments — All officers involved should have specific duty assignments while conducting the safety *281 check deployment and these should be noted on the worksheet.
3. In choosing a site for the safety check deployment, a location should be considered which offers sufficient lighting and which would allow officers to provide sufficient warning to motorists in advance of the stop. The advance warning can be accomplished by posting a sign or an officer with a marked police unit a safe distance from the actual stopping point.
4. Officers conducting a safety check deployment should easily be identifiable by uniform or other distinguishing features. The safety vest provided by the Sheriffs Office shall also be worn.
5. The supervisor in charge of the safety check deployment shall ensure that adequate manpower is available so as to minimize the delay of the driver.
6. Appropriate enforcement action should be taken when law violations are discovered.
7. Supervisors in charge of the operation shall ensure that the Directed Patrol Worksheet is completed and submitted to their Watch Commander or appropriate supervisor.
Officers also prepared a Directed Patrol Worksheet which described the deployment strategy: “Stop motorists on Mandarin Rd. for a traffic safety check. Have a motorcycle w/radar on each end of check to monitor speed.”
The officer in charge of the deployment, Lt. Weintraub, gave field officers oral instructions. The plan of the deployment was to stop each car passing through the roadblock. An officer then immediately explained to the driver the purpose of the roadblock, inspected the driver’s license, and conducted a visual safety cheek. Any driver who did not have a driver’s license, or for whom a citation would have to be written for any other reason, would be diverted into a nearby parking lot. On two or three occasions during the five-hour deployment, the traffic back-up caused a safety concern, and accordingly “a quantity of ears would have been waved through, and at that point we would have been back to stopping every car again.” The officers were in uniform and equipped with safety vests and flashlights with lighted cones. Six large signs alerted motorists to prepare to stop. Lieutenant Weintraub testified that if no violations were observed, the stop would take less than 60 seconds. The record contains no evidence of complaints about the procedure, other than Campbell’s.
Unquestionably, stopping an automobile and detaining its occupant constitutes a seizure within the meaning of the Fourth Amendment to the United States Constitution. Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). As with all warrantless searches and seizures, courts determine the constitutionality of roadblocks by balancing the legitimate government interest involved against the degree of intrusion on the individual’s Fourth Amendment rights. Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); Prouse, 440 U.S. at 656-657, 99 S.Ct. at 1397-1398; Martinez-Fuerte, 428 U.S. at 555, 96 S.Ct. at 3081. This balancing test involves three considerations: (1) the gravity of the public concern that the seizure serves; (2) the degree to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty. Brown, 443 U.S. at 50-51, 99 S.Ct. at 2640.
Applying these considerations, we look first at the gravity of public concern and the degree to which the seizure advanced the particular public interest at stake. The state has a vital interest in the health, safety and welfare of its citizens which justifies reasonable use of roadblocks to enforce motor vehicle safety laws and to prevent traffic accidents. The public is best served by a regime that deters drivers from traveling in unsafe vehicles and identifies safety defects before the vehicles are involved in accidents. See State v. Patterson, 582 A.2d 1204 (Me.1990).
We must, of course, also consider the severity of the interference with individual liberty. Because the goals of the roadblock in question were to check for speeding, make a visual safety inspection of vehicles, and to *282 generally educate the public, the procedure employed resulted in a minimal degree of intrusion on individual liberty. See Michigan Dep’t of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (minimal degree of “objective” intrusion occurs in brief stop at sobriety checkpoint). The determination of whether violations occurred involved objective findings and left little to the discretion of the officers. If no violations occurred, the stop took less than 60 seconds. The roadblock method chosen was speedy and effective as demonstrated by the fact that 92 citations were issued in a five-hour period.
Appellant strenuously argues that the degree of discretion maintained by the Jacksonville officers is fatal to the arrest in this case. Defendant points to Lt. Weintraub’s testimony that on two or three occasions, due to safety concerns from a traffic back-up, officers waved an undetermined number of vehicles through the roadblock. According to appellant, “the officers were constrained only by their own discretion in permitting these uncounted groups of vehicles to proceed unchecked.” We disagree with this analysis. It is undisputed in this case that the officers’ discretion was utilized only in a practical matter to alleviate safety concerns. At oral argument, appellant argued that such degree of discretion as would allow the officers to wave on any vehicles because of safety concerns would be fatal to the procedure. Such a mechanistic approach is not, in our view, required by the Fourth Amendment. Appellant has not persuaded us that the minimal discretion exercised by the sheriffs office in conducting the roadblock was a severe interference with the motorists’ liberty interest such as to automatically tip the balance against reasonableness. The United States Supreme Court requires that the field officers’ discretion “be circumscribed, at least to some extent,” but does not mandate elimination of all discretion. Michigan Dep’t of State Police v. Sitz, 496 U.S. at 454, 110 S.Ct. at 2487; see also Cardwell v. State, 482 So.2d 512, 514 (Fla. 1st DCA 1986) (“What is clear is that the exercise of unbridled discretion by law enforcement officers in situations involving stops and searches is not reasonable ... Although it is desirable to give law enforcement authorities bright line rules within which to operate, the reasonableness standard required by the Fourth Amendment does not lend itself to absolute definition.”).
Supplementing his argument of unfettered discretion on the part of the officers, appellant contends that the absence of specific written guidelines rendered the roadblock fatally defective. He cites to State v. Jones, 483 So.2d 433 (Fla.1986), and Hartsfield v. State, 629 So.2d 1020 (Fla. 4th DCA 1993), which relies exclusively on Jones. The Florida Supreme Court in Jones indicates that “it is essential that a written set of uniform guidelines be issued before a roadblock can be utilized.” 483 So.2d at 438. The court stated that written guidelines should cover in detail the procedures which field officers are to follow at the roadblock and should ideally set out “with reasonable specificity procedures regarding the selection of vehicles, detention techniques, duty assignments, and the disposition of vehicles.” Id. If the guidelines fail to cover each of these matters, they do not necessarily fail. Instead, the courts should view each set of guidelines as a whole in determining the plan’s sufficiency. Id. The supreme court in Jones acknowledged that Jones’ arrest occurred prior to the effective date of the 1983 amendment to article I, section 12, and the 1983 amendment cannot be applied retroactively. 483 So.2d at 435, n. 1.
Article I, section 12, as amended in 1983, provides the right to be free from unreasonable searches and seizures “shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.” Art. I, § 12, Fla. Const. (1983). As noted in Nelson v. Lane County, 304 Or. 97, 743 P.2d 692, 700 (1987), the United States Supreme Court “has not indicated that written standards for roadblocks are necessary.” We likewise have found no United States *283 Supreme Court decisions which require specific written guidelines for roadblocks. The conformity amendment to article I, section 12, requires a Florida court to look at the United States Supreme Court for guidance in this type of case. Although the United states Supreme Court has not adopted a written guidelines requirement, it has stated that the legitimate government interest involved in roadblocks must be balanced against the degree of intrusion on an individual’s Fourth Amendment rights in each ease. Prouse, 440 U.S. at 656-657, 99 S.Ct. at 1397-1398. We find that the order below satisfies this requirement.
The decision in Hartsfield v. State does not control because in that case there were no written guidelines whatsoever. Instead, the authorities relied upon a standard operating procedure in order to limit the discretion of the individual officers. 629 So.2d at 1021. Beyond noting the absence of any written guidelines, the Hartsfield court did not engage in a Fourth Amendment balancing analysis.
In the present ease we do not find a violation of our own supreme court’s written guidelines requirement. In discussing the preparation and use of guidelines, our supreme court said:
Law enforcement officials must conduct sobriety checkpoints so as to minimize the discretion of field officers.... Written guidelines should cover in detail the procedures which field officers are to follow at the roadblock. Ideally, these guidelines should set out with reasonable specificity procedures regarding the selection of vehicles, detention techniques, duty assignments, and the disposition of vehicles. (Citations omitted). Of course, if the guidelines fail to cover each of these matters they need not necessarily fail. Rather, courts should view each set of guidelines as a whole when determining the plan’s sufficiency. (Emphasis added).
Jones, 483 So.2d at 438.
In our judgment, the comprehensive Operational Order, coupled with the admittedly limited Directed Patrol Worksheet plus the oral instructions, substantially comply with the directives of Jones and “minimize the discretion of field officers.” We do not find that the officers’ safety concerns for eliminating congestion should be characterized as disobedience of the guidelines. Rather, the officers correctly exercised judgment, i.e., the proper use of discretion, in temporarily suspending the roadblock to alleviate a traffic hazard. The record is devoid of any other indication of discretionary or arbitrary conduct on the part of the officers.
Operational Order 12.1.1 was issued by the sheriffs office for the purpose of providing patrol personnel with procedures for developing strategies for safety check deployments. The supervising officer in this case filed a Directed Patrol Worksheet indicating the location, purpose, manpower and equipment needed, as well as the strategy for the specific roadblock at issue. We do not read Jones to require inelastic or “one size fits all” written directions. Nor do we believe that the Fourth Amendment requires such. We also find it important for the court, both at the trial level and the reviewing level, to consider whether the guidelines, as executed, sufficiently constrain the officers’ discretion so as to not run afoul of the United States Supreme Court cases we have noted in this opinion. In this case, no showing has been made that the trial court abused its discretion in finding the written guidelines sufficient under the circumstances.
Our decision is bolstered by the recent federal decision, Merrett v. Moore, 58 F.3d 1547 (11th Cir.1995). In Merrett, the Florida Department of Law Enforcement (FDLE) and the Florida Highway Patrol (FHP) conducted roadblocks on two days for six hours a day at four sites for purposes of (1) cheeking drivers’ licenses, vehicle registrations and obvious safety defects and (2) intercepting illegal narcotics by having canines sniff the vehicle’s exterior for narcotics. The court considered whether the roadblocks were reasonable in light of the state’s interest in conducting roadblocks, the effectiveness of the operation in promoting that interest, and the level of intrusion of the individual’s privacy caused by the checkpoints. The court held that the roadblock did not violate the constitution because the balance of the state’s interest in enforcing its license and *284 registration requirements and the degree of intrusion on individual motorists who experienced only slight delays weighed in favor of the state’s program. The court noted that the PHP were given copies of the operational plan and instructed to stop all traffic until traffic became congested, in which case vehicles were to be waved through as necessary to avoid long backups. The court stated:
At roadblocks, the stop involves no individual discretion of officers in the field.... [E]veryone traveling on the road at the time of the operation is stopped and subjected, at least initially, to the same investigation. So, one officer’s individual discretion does not affect the determination of who is stopped. Because the police officer discretion is not at the heart of the roadblock stop, no selective targeting occurs.
58 F.3d at 1550, n. 2. In both Merrett and the instant case, officers were instructed to wave through cars if a backup occurred. They both appeared to have the same amount of discretion. Moreover, the instant roadblock was much more effective[1] and less intrusive because it did not involve narcotic sniffing canines. Accordingly, we AFFIRM the order denying appellant’s motion to suppress.
BARFIELD and KAHN, JJ., concur.
VAN NORTWICK, J., dissents w/written opinion.

. In Merrett, one person was arrested for possession of illegal narcotics and 61 vehicle-related citations were issued over a two-day period during the six-hour roadblocks at four sites. In the present case, a five-hour roadblock at one location resulted in the issuance of 92 citations.