**UNITED STATES of America**

v.

**Tony HOLLOMAN.**

**No. 95–196–CR–T–17.**

United States District Court,
M.D. Florida,
Tampa Division.

Dec. 12, 1995.

Matthew Hart Perry, Federal Public Defender's Office, Tampa, FL, for defendant.

James A. Muench, U.S. Attorney's Office, Tampa, FL, for plaintiff.

### *ORDER DENYING MOTION TO SUPPRESS*

KOVACHEVICH, District Judge.

This cause is before the Court on Defendant's Motion to Suppress Evidence and Statements (Docket No. 15); Report and Recommendation (hereafter R & R) issued by Magistrate Judge Mark A. Pizzo on Octo-

918

ber 19, 1995 (Docket No. 27); the Government's Objections to the Report and Recommendation (Docket No. 28); and the Defendant's Opposition to the Government's Objections (Docket No. 29).

On September 5, 1995, the defendant filed his motion to suppress, seeking to suppress the following: 1) approximately 694 grams of cocaine base seized on June 29, 1995; 2) any and all tangible items having any evidentiary value to the government seized at that time, or any other items of evidence derived as a result of the search; 3) any and all statements made by the defendant to any and all law enforcement officers involved in this incident; and 4) any scientific reports generated as a result of this case. This Court, on September 22, 1995, referred the motion to suppress to the assigned magistrate judge for proceedings, including an evidentiary hearing, and issuance of a Report and Recommendation (Docket No. 22).

Magistrate Judge Pizzo held an evidentiary hearing on the suppression motion on October 2, 1995, and issued his R & R on October 19, 1995. The R & R concludes: "Although the detectives had probable cause to stop the Defendant for a traffic violation, I find that it was unreasonably pretextual and unconstitutional. For the reasons given, I recommend that Defendant Holloman's Motion to Suppress Evidence and Statements (doc. # 15) be GRANTED."

## STANDARD OF REVIEW

Under the Federal Magistrate's Act, Congress vested Article III judges with the power to conduct evidentiary hearings and to submit proposed findings of fact and recommendations for the disposition of certain pretrial matters. 28 U.S.C. § 636. Within ten (10) days after being served with the R & R, any party may file written objections to the proposed findings of fact and recommendations. 28 U.S.C. § 636(b)(1).

When a timely objection is made, the determination is subject to a *de novo* review by the district court. However, portions of the R & R that are not objected to will be evaluated by the district court under a clear-ly erroneous standard. *Gropp v. United Airlines, Inc.,* 817 F.Supp. 1558 (M.D.Fla.1993).

## FINDINGS OF FACT

The report and recommendation sets forth a thorough recitation of the facts established by the transcript of the evidentiary hearing and exhibits. The Court finds only three (3) objections stated by the government to the proposed findings of fact set forth by Magistrate Judge Pizzo. First, the government objects to the reference in the report and recommendation that the operation involved "roving patrols." The government asserts that because the operation was conducted at a single location, "Interstate 275, just north of the Skyway Bridge on the Pinellas County side of the span". it is not a "roving patrol" but is instead similar to a "checkpoint" or "roadblock."

This objection by the government points out the fundamental issue that underlies the entire analysis of the Fourth Amendment problem before the Court. A thorough review of the facts demonstrates that the operation instituted by the police in this case does not fit neatly into either category. The officers here established a traffic checkpoint of sorts. The specific geographic space selected functioned as a funnel that required all traffic traveling north, from Manatee County to Pinellas County, to pass by the officers. Essentially, the location of the operation represented the ideal spot for what is colloquially known as a "speed trap."

The officers involved confined the operation to a very specific geographic area and in this sense the operation was similar to the "checkpoint" or "roadblock" cases. However, the officers did not stop every vehicle that passed by, and that is where the operation diverged from the typical roadblock scenario and begins to resemble the "roving patrol."

By clearly denominating the police activity a "roving patrol," the Court would essentially disregard the elements of the operation that do in fact resemble the traditional "roadblock." This Court finds the appellation "roving patrol" to be overly rigid and that this is in fact a novel case, involving elements of both a roadblock and a roving patrol. Rather than forcing the facts into one or

another precedent, this Court is of the opinion that this is a case of first impression that demands a hybrid analysis. In as much as the R & R refers only to "roving patrols," rather than the operation as an anomaly, the government's objection is sustained.

Next, the government states that the R & R is incorrect when it states that it was necessary to detain motorists until a dog and his handler appeared at the scene. The Court finds that the R & R reflects the testimony of the witnesses when it states: "*Unless* the canine unit had followed the marked police cruiser during the chase, or had arrived shortly after the stop, the motorist would be detained until the dog and his handler appeared at the scene." (R & R pg 3, transcript 22–24, 101) (emphasis supplied). The amount of time delay is not noted, nor is the exact location from which the canine unit was directed to any given scene for use. Also, it is not noted how many motorists, if any, were required to wait for the canine unit. What is clear, however, is that as applied to Defendant Holloman, no delay took place since the canine was already on the scene when called into service in his case. As stated, the R & R is correct to the extent that some drivers may have been delayed briefly while awaiting the arrival of a drug sniffing dog. Thus, the government's objection is overruled.

Finally, the government objects to the finding of the magistrate judge that "once law enforcement explained to Holloman the reason for his stop (the traffic infraction), their 'focus shifted' and the reason for Holloman's detention 'changed.'" The Court agrees with the R & R that the primary focus changed for law enforcement during the stop. Once the explanation was made to the stopped individual as to the alleged traffic infraction, the focus shifted to the interdiction of drugs. This is not to say that the officers did not continue to pursue the traffic infraction, which, in the case of Holloman, was a legitimate nighttime traffic concern. Rather, their primary focus was then on the drug interdiction and not the traffic infraction. The Court finds nothing erroneous in this finding.

The Court has reviewed the remainder of the findings of facts proposed by the R & R and finds them supported by the record evidence with one exception. Page one of the R & R states that the Vice and Interdiction Unit of the Pinellas County Sheriff's Office established the operation under scrutiny, but, in fact, the Vice and Narcotics Unit of the St. Petersburg Police Department was the unit which established the operation. (Transcript testimony of Detective Riley). Therefore, the Court adopts the findings of fact by reference herein.

■ In summary, the following facts were established, which facts are not all inclusive, but are some of the most pertinent facts recited in the R & R:

1. The police department, in order to stop the flow of narcotics into Pinellas County from the south, formed an interdiction operation on the north side of the Skyway Bridge.

2. The unit, operating under a verbal plan and procedures, patrolled the area whenever they had time and were able to gather the officers necessary for the operation. They stopped motorists observed to be in violation of Florida's motor vehicle code. The stated exception to the stop procedures related to motorists who exceeded the speed limit by a few miles an hour; this was discretionary with the officers on the scene and might mean those speeding only five (5) m.p.h. or maybe even up to ten (10) m.p.h. over the posted limit.

3. The officers in the program were not dressed in the typical uniforms of either the police department or the traffic units. Instead, each officer wore the "raid gear" issued by the vice and narcotics unit.

4. After the stop, one officer would explain the traffic violation which they asserted occurred. Then the same or another officer would explain the drug interdiction prong of the stop and ask for voluntary permission to search the stopped vehicle. If permission was given, the vehicle was searched while an officer completed the traffic infraction part of the stop, concluding in either a citation or an oral warning.

5. If no permission to search was given, an officer assigned to the canine unit would escort the drug sniffing canine on an exterior route around the vehicle. If the dog alerted to drugs, the vehicle would be further searched.

6. During eleven (11) nights of the operation approximately 79 motorists were stopped, 65 received oral warnings and 14 were cited for traffic violations. The defendant was the only motorist to be cited for an equipment violation.

7. The defendant was stopped by the interdiction unit on the night of June 29, 1995, at about 10:30 p.m. for not having a tag light in violation of Florida Statute § 316.221(2). After being told that the officers did not have a search warrant, the defendant refused the request for voluntary search and the drug sniffing dog was brought in to do an exterior march around his vehicle. The canine alerted to drugs, in that she jumped into the bed of the truck and exhibited alert behavior. The canine also scratched near the passenger door while exhibiting alert behavior. This led officers to believe the vehicle contained illegal narcotics. Once in the interior, the canine alerted officers to a box on the floor.

8. The unit arrested the defendant after finding over a half a kilo of crack cocaine in the box to which the canine had alerted the officers. The defendant was properly read his Miranda rights and subsequently made admissions regarding the contraband.

## DISCUSSION

The magistrate judge's analysis applies the standard set forth in *United States v. Smith*, 799 F.2d 704 (11th Cir.1986) to analyze and determine the suppression motion. The appellate court in the *Smith* case stated:

We conclude that in determining whether an investigative stop is invalid as pretextual, the proper inquiry is whether a reasonable officer would have made the seizure in the absence of illegal motivation. (emphasis in original) *Smith*, at pg. 708.

The government asserts that the magistrate judge improperly applied the *Smith*

analysis because the operation in question is fundamentally different from the "roving patrol" stop at issue in *Smith*. Respectfully, the Court must agree with the government's position. The "traffic trap," while not a roadblock, is an organized police operation distinct in character from a roving patrol of an individual officer. Rather than limiting the analysis to the "roving patrol" line of cases, the Court will employ a two-step analysis of the case. First, a determination of the constitutionality of the operation in general will be addressed; then the Court will turn its attention to how the individual Defendant was dealt with in this case.

### Constitutionality of the Police Operation

■ It would appear that all parties would agree that if the St. Petersburg Police Department had set up a roadblock at the Skyway Bridge to check the license and registration of every traveler to Pinellas County, though the primary reason for the roadblock was drug interdiction, that the operation would pass Constitutional muster. In fact, that is precisely what was allowed recently by the Eleventh Circuit Court of Appeals in *Merrett v. Moore*, 58 F.3d 1547 (11th Cir. 1995). The entire operation was "pretextual" in nature and yet did not result in a constitutional violation of individual Fourth Amendment rights.

In addition, it is clear that the officers involved in this particular case were acting within their authority by making traffic stops, even though they were narcotic detectives. Traffic checkpoints or "Speed Traps" are set up daily in various locations throughout the State of Florida. These operations are legitimate and pursue the important state interest of traffic enforcement and highway safety.

Somehow though, based on the combination of elements of the two of types of operations, Defendant contends that the searches incident to the traffic stop are transformed into unconstitutional violations of individual Fourth Amendment rights. The Court finds such a result illogical. If searches of this type are constitutionally permissible when visited upon law-abiding citizens in a road-

block case, how could they be constitutionally infirm when applied to one who has violated the law, albeit in a minor fashion?

■ As the Eleventh Circuit pointed out in *Merrett:*

> Where the state has one lawful purpose sufficient to justify a roadblock, that the state also uses the roadblock to intercept illegal drugs does not render the roadblock unconstitutional. In other words, we adopt a totally objective rule: a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock, even if no roadblock would have been put in place but for the state's desire to hunt for unlawful drugs.

58 F.3d at 1551. The Interdiction Unit's operation had one lawful purpose sufficient to justify stopping Defendant Holloman and the other motorists. Because law enforcement also used the operation to intercept illegal drugs does not render the operation unlawful.

## I. Intrusiveness of the Stops in the Interdiction Operation

The R & R cites the following Supreme Court language for the proposition that the facts of this case do not support the government's claim that this is akin to a roadblock case, but is instead a roving patrol: "[We] view the checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *United States v. Martinez–Fuerte,* 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976).

The obvious concern expressed by the Supreme Court is the intrusiveness of any operation upon the rights of *lawful travelers.* In this case, the rights of lawful travelers are not affected at all. The individual that obeys all of the traffic laws goes right on by without the least inconvenience. Thus, the fear engendered in law-abiding citizens is nonexistent in this case since all of the stops involved individuals that had committed traffic infractions. Certainly this operation is *less* intrusive than a roadblock that stops every motorist and can delay even law-abid-

ing individuals for long periods of time, rather than the five (5) or ten (10) minutes involved here.

## II. Officer Discretion

A great deal of Defendant's argument that the Interdiction Operation is fundamentally different from a roadblock, and, thus, is unconstitutional, surrounds the discretion given to the individual officer in the field. "At roadblocks, the stop involves no individual discretion of officers in the field, .... [E]veryone traveling on the road at the time of the operation is stopped and subjected, at least initially, to the same investigation." *Merrett,* 58 F.3d at 1550, n. 2.

In every traffic stop, there is unquestionably some element of discretion involved. In this case though, it was the express plan of the operation to stop all traffic violators indiscriminately, and subject all of the offenders to the same investigation. The only discretionary deviation from this plan identified in the record is that individuals traveling at a rate of speed five (5) to ten (10) miles per hour over the posted speed limit were not stopped. This "operational decision" was made because the staffing of the operation (8 officers) would not permit stopping every speeder since virtually every car exceeded the speed limit.

A similar discretionary "operational decision" is made routinely in the roadblock cases. "State planners anticipated the possibility of traffic backing up at the roadblocks; so, they instructed officers to wave cars through the checkpoints as necessary to avoid congestion." *Merrett,* 58 F.3d at 1551, 1552. This, too, is a discretionary decision. It is decision forced by the practical aspects of the operation, just like the officers decision to not stop those traveling only five (5) or ten (10) miles per hour over the posted limit in this case. The Court finds no abuse of discretion on the part of the officers in the record of this case.

In addressing the effectiveness of a highway sobriety checkpoint in *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court pointed out that it did not mean

"to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." 496 U.S. at 453–454, 455, 110 S.Ct. at 2487, 2487–88.

The drug interdiction operation in this case could certainly have benefitted from written standard operating procedures, more in-depth involvement by higher officials within the police department, and better documentation of the actual stops and citations issued. To place undue emphasis on these elements, however, would raise form over substance. The officers verbally went over the plans and procedures for the operation, implementing those plans methodically and consistently on the eleven (11) evenings of the traffic/dangerous drug interdiction operation employed by the St. Petersburg Police Department. The operation functioned indiscriminately in that every traffic offender was treated the same. Consequently, this Court finds that the operation, as applied in the field, did not violate the constitutional guarantees of the Fourth Amendment.

### Constitutionality of Holloman's Arrest

The two (2) cases primarily relied upon for suppressing the evidence in this case are the Eleventh Circuit opinions in *United States v. Smith*, 799 F.2d 704 (11th Cir.1986) and *United States v. Valdez*, 931 F.2d 1448 (11th Cir.1991).

In *Smith*, Trooper Vogel stopped the defendant for weaving six inches into the emergency lane of a highway. This violation was observed only after Trooper Vogel had made the determination that the defendant fit a "drug courier profile." The district court expressly found that any "weaving" was only a pretextual reason for the stop. Trooper Vogel made no attempt to investigate the possibility of intoxication or other reason for the weaving; instead, his *sole* attention was focused on a drug investigation. The Eleventh Circuit found that the objective evidence showed that Trooper Vogel had no interest in the traffic infraction and that a reasonable officer would not have stopped the defendant for such a minor deviation. "*Smith* indicates the unconstitutional act occurs when an officer selectively targets a particular person based on the officers subjective belief, not amounting to probable cause, that the person engaged in unlawful conduct other than a traffic violation." *Merrett*, 58 F.3d at 1550, n. 2.

In *Valdez*, the stop of the defendant was made for violating the right of way of another vehicle when the defendant made a right turn at a red light. During the suppression hearing in the district court, the arresting officer testified that, but for instructions he received over the radio from narcotics detectives that they wanted the Valdez vehicle stopped, he would not have pursued the car and issued the traffic citation. As in *Smith*, the pretextual nature of the stop involved the selective targeting of one individual.

■ In this case there is no evidence that the officers "selectively targeted" Holloman and based upon their subjective suspicions of drug activity that they "created" reasonable suspicion through a minor traffic violation in order to allow the stop. In fact, the objective evidence points to the contrary. Seventy-nine (79) stops were made during the eleven evenings of the operation for a variety of traffic infractions. Of those stopped only two (2) were arrested for drug offenses. There is no competent evidence to indicate that the officers made the stop of Holloman on any basis other than the traffic violation. Holloman's violation of Florida Statute § 316.221(2), having no tag light, is objectively determinable. Either he had a tag light or he did not. It involves no subjective determination of weaving that would require further investigation to determine if a violation in fact occurred. The officers clearly had objectively reasonable probable cause for the stop. Holloman was then subjected to

the same post detention procedures as the rest of those stopped.

The Court is of the opinion that there are in fact two (2) types of "pretext" that exist in the law of the Eleventh Circuit. One is an "operational pretext," such as the pretext that encompasses the traffic operation in this case as well as the roadblock situations. That type of pretext has been found permissible. The other is an "individual pretext" that is formed after an individual officer observes a particular citizen and selectively targets that individual based upon the officer's own subjective suspicion that there has been a criminal violation other than the traffic infraction. The traffic infraction is then virtually created by the officer to achieve his or her illicit purpose.

Once again, the officers in this case treated every stopped motorist the same. All those stopped were subjected to the same investigation and Mr. Holloman was not "selectively targeted" for the stop in this case.

Defendant argues that the narcotics officers that stopped Holloman would not have stopped him for the particular violation if it were not to search for illegal drugs. Upon this basis it is argued that the stop in this case fails the *Smith* test. However, the actions of the officers involved in this case cannot be analyzed in a vacuum, as though they were simply on their way home from the office at the end of the day. Defendant's argument fails to take into account that for the stop in question, the narcotics detectives were charged with the duty of traffic enforcement. Any officer or detective, whether from homicide, robbery or any other division, would have made this traffic stop *as an officer of this patrol*, even though on a daily basis their duties did not include making traffic stops.[1] "This Court can presume no less than that a patrol officer would obey this mandate." *United States v. Bates*, 840 F.2d 858, 860 (11th Cir.1988).

Thus, this Court does not find the stop of Defendant Holloman in this case to be vested with the sort of insidious and unconstitutional pretext that is selectively visited upon an individual based solely upon subjective suspicion. As a result, the stop and search were not unconstitutional and the evidence seized should not be suppressed. Accordingly, it is

**ORDERED** that the Report and Recommendation (Docket No. 27) be **REJECTED;** the Objections of the Government (Docket No. 28) be **sustained** as discussed in the Order; and the Motion to Suppress (Docket No. 15) be **DENIED.**

**DONE and ORDERED.**

---

[1] Interestingly, Defendant Holloman was stopped for the same tag light infraction on August 30, 1995, approximately two months after the arrest at issue in this case. The infraction was identified by an officer that was unaware of Holloman's prior stop.