UNITED STATES of America,
Plaintiff–Appellee,

v.

Judith Ann HUGUENIN (97–5152) and
William A. Martin (97–5160),
Defendants–Appellants.

Nos. 97–5152, 97–5160.

United States Court of Appeals,
Sixth Circuit.

Argued April 28, 1998.

Decided Aug. 18, 1998.

Rehearing Denied Oct. 19, 1998.

Mary M. Aubry (argued and briefed), Assistant U.S. Attorney, Knoxville, Tennessee, for Plaintiff–Appellee.

Wade V. Davies (argued and briefed), Ritchie, Fels & Dillard, Knoxville, Tennessee, for Defendant–Appellant Huguenin.

Wade V. Davies (argued), Ritchie, Fels & Dillard, Knoxville, Tennessee, Ralph E. Harwell (briefed), Law Offices of Ralph E. Harwell, Knoxville, Tennessee, for Defendant–Appellant Martin.

Before: KENNEDY, CONTIE, and MOORE, Circuit Judges.

CONTIE, J., delivered the opinion of the court, in which MOORE, J., joined. KENNEDY, J. (pp. 563–565), delivered a separate dissenting opinion.

## OPINION

CONTIE, Circuit Judge.

Defendants-appellants Judith A. Huguenin and William A. Martin appeal the denial of their joint motion to suppress evidence obtained after a search and seizure at an automobile checkpoint. Following their conditional pleas of guilty for possession with intent to distribute marijuana, defendants challenged the constitutionality of police procedures used to stop motorists exiting off a Tennessee highway upon warning that motorists are approaching a narcotics/DUI checkpoint. Because we conclude that the procedures used by law enforcement officers were unconstitutional, we **REVERSE** the denial of the defendants' motion to suppress.[1]

### I.

On March 19, 1996, defendants Judith Huguenin and William Martin were each indicted on one count of possessing with the intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The charges stemmed from defendants' detention at a drug/DUI checkpoint at the Airport Road exit off Interstate 40 in Roane County, Tennessee.

On March 14, 1996 at approximately 4:30 p.m., Ms. Huguenin and Mr. Martin were traveling eastbound on Interstate 40. Mr. Martin was driving, and Ms. Huguenin was in the front passenger's seat. In Roane County, Tennessee, they passed two large, square signs with the words "DRUG–DUI ENFORCEMENT CHECK POINT ½ MILE AHEAD." One sign was on each side of the road. Mr. Martin turned onto an exit ramp for Airport Road about 150–200 yards or a quarter mile after the signs. When a driver exits at Airport Road, the end of the long exit ramp is not immediately visible as the ramp curves and bears to the left. When Mr. Martin drove up the exit ramp, there were four orange cones on the side of the road near the turn at the end of the exit. Two were on each side–the first two approximately three to four feet from the intersection, the next two approximately fifteen to twenty feet from the first. The checkpoint was at the end of the exit at a stop sign.

Officer Dennis Worley of the Roane County, Tennessee Sheriff's Department had established this checkpoint as a "ruse" to stop motorists who chose to exit off the highway after viewing the signs warning of an upcoming DUI/narcotics checkpoint on the highway. Although the two signs posted on eastbound I–40 read "DRUG–DUI ENFORCEMENT CHECK POINT ½ MILE AHEAD," the officers had no checkpoint in place on the highway. Instead, Officer Worley set up the checkpoint at the end of the Airport Road exit ramp, which is the first exit available to motorists after the posted signs, but is not frequently used, because no services are offered at that exit. Motorists could not see the officers at the roadblock at the end of the ramp until they came around the curve—approximately 50 to 100 yards into the uphill exit ramp. After a motorist gets off at the exit, there is no place to turn around to avoid the checkpoint as it is illegal to back down an exit ramp in Tennessee.

---

1. Defendant Martin also appeals the district court's method of calculating, for sentencing purposes, the weight of marijuana seized, but we need not reach this issue as we reverse his conviction.

The checkpoint had been authorized by the Roane County Sheriff's Department, which had established a policy in December 1994 regarding the proper procedures for setting up and running a narcotics/sobriety checkpoint. The ostensible goal of the policy was "to remove impaired drivers from our highways as safely as possible with due regard to the safety of the public and the officer(s)." The procedure used at the checkpoint was for an officer to approach the motorist at the stop sign. No set questions were asked. It was left to the discretion of the officer whether or not to ask the motorist his reasons for exiting at Airport Road. Depending on the response, the officer would question the motorist further or allow the vehicle to proceed.

On average, it took an officer operating the checkpoint approximately ten to fifteen seconds to determine whether a driver was intoxicated. While the checkpoint was in operation, the county's drug dog, King, was always present. There was, however, never a breathalyzer at the checkpoint. Although the checkpoint's main operator had asked for a breathalyzer, none had been provided. Objects seized at the checkpoint were subject to forfeiture. The money raised through forfeiture went into the county's drug fund, which "funds narcotics enforcement," and into the D.A.R.E.[2] program.

Officer Worley had utilized this "ruse" sixty-five times at the Airport Road exit prior to May 14, 1996. On that day, the roadblock operated from 1:30 p.m. to 5:15 p.m. At 4:30 p.m., five law enforcement officers were present: Sheriff's Deputy Dennis Worley, Reserve Officers Joe Brock, Steve Halcolmb, and Jason Halcolmb, and an unidentified Highway Patrolman.[3] Each officer was in uniform and armed. With the men were five vehicles: a marked sheriff's car, a marked Highway Patrol car, two unmarked law enforcement cars, and a D.A.R.E. trailer.

When defendants exited at Airport Road on April 14, 1996, a sign normally posted to inform motorists about the purpose of the checkpoint was absent from the ramp. Officer Joe Brock, a volunteer reserve officer with no specific training in detecting intoxicated drivers, approached their vehicle. He indicated that there was no set procedure for stopping cars, and he just happened to be there when defendants drove up. It was left up to Brock's discretion on how to question motorists. He decided that when the vehicle's license plate revealed out-of-state tags, he would ask the motorist his or her reason for using the exit. Because defendants' vehicle displayed Wyoming tags, Brock informed defendants that they had been stopped at a Roane County drug/DUI checkpoint and asked defendant Martin, the driver, why he had exited at Airport Road.

When Mr. Martin replied that they were in search of gasoline, Officer Brock looked at the gas gauge and saw that it indicated a full tank. Officer Brock did not notice anything that indicated that Mr. Martin had been drinking and did not ask him if he had been drinking. He detected no alcohol on his breath and noticed no other indicators of intoxication. After Officer Brock had spoken to defendants for approximately one to two minutes, Officer Worley approached the car, and Officer Brock backed away.

Officer Worley addressed defendants through the driver's window. He also told

2. D.A.R.E. is an acronym for Drug Abuse Resistance Education, an educational program offered through local public schools. In Roane County, the D.A.R.E. program is funded by the Sheriff's Department's Drug Fund and is taught by Officer Worley.

3. Officer Worley had decided where to establish the checkpoint, had erected it, and was supervising it. Although each checkpoint and its location had to be approved by either the Sheriff or the Chief Deputy, none of Officer Worley's suggestions or ideas had ever been refused. Officer Worley had worked for the sheriff's department for approximately three and a half years, and he was the department's Narcotics Officer. His duties included qualifying deputies for firearms licenses, teaching school children through the D.A.R.E. program, and enforcing laws regarding narcotics. He had been trained in DUI detection in 1990.

Officer Brock was a jailer who had worked for the county for approximately two years. He was also a reserve officer, who volunteered to patrol county roads and assist in the set up and operation of checkpoints. He had never been trained in DUI detection. Officers Steve and Jason Halcolmb were reserve officers who were merely onlookers on March 14, observing the checkpoint and learning from its operation.

them that they had entered the Roane County Sheriff's Department's drug/DUI checkpoint, and that the officers were looking for individuals who were driving under the influence or transporting illegal drugs. Officer Worley also noticed that defendants' car had Wyoming tags. He testified that Mr. Martin gripped the steering wheel and did not look at him at all during the conversation. He testified that Ms. Huguenin looked at him, but was shaking and nervous. He asked whether Mr. Martin needed help because he had exited at a ramp where no services were located. When Mr. Martin informed him that he pulled off to fill his gas tank, Officer Worley accused him of lying, and Mr. Martin did not respond. Officer Worley then asked for consent to search the van, which was denied.

Believing he had enough reasonable suspicion to conduct a canine search, Officer Worley brought the drug dog to the van, where it alerted to the back of the van. Officer Worley informed defendants of the indication, told them he was going to search the van, and asked them to step out. Around this time, Ms. Huguenin spontaneously informed Officer Worley that she had a small bag of marijuana in a coat pocket inside the van. Mr. Martin stated that he had not seen the dog indicate. The dog was brought back and again indicated at the back of the van. Officer Worley got the keys and opened the back door of the van, and the dog alerted to a blanket on the floor. Officer Worley searched the van and found 265.7 pounds of marijuana hidden in several bags under the blanket. He immediately arrested defendants.

Defendants Martin and Huguenin were indicted on one count of possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). On April 26, 1996, they filed a joint motion to suppress. They challenged the validity of the checkpoint, arguing that it unconstitutionality tainted the detention and search that subsequently occurred. A magistrate judge filed a Report and Recommendation denying the joint motion to suppress on June 4, 1996. After an evidentiary hearing to determine the purpose of the checkpoint, the district court adopted the Report and Recommendation on October 7, 1996, and denied the motion to suppress.

Ms. Huguenin and Mr. Martin then entered conditional pleas of guilty on November 19, 1996, reserving their right to appeal the constitutionality of the checkpoint. In addition, Mr. Martin reserved the right to appeal the district court's calculation of the amount of marijuana for sentencing purposes.

On January 24, 1997, the district court sentenced Ms. Huguenin to two years, six months imprisonment and four years supervised release. On January 27, the court sentenced Mr. Martin to five years imprisonment and four years supervised release. Ms. Huguenin and Mr. Martin filed timely notices of appeal on January 23 and January 24, respectively.

## II.

Defendants challenge the constitutionality of the roadblock procedure used on March 14, 1996, arguing that the search and seizure that occurred violated the Fourth and Fourteenth Amendments. The district court's determination that no unconstitutional violation occurred is a conclusion of law which we review *de novo;* however, we review the lower court's factual findings only for clear error. *United States v. Duncan,* 918 F.2d 647, 650 (6th Cir.1990), *cert. denied,* 500 U.S. 933, 111 S.Ct. 2055, 114 L.Ed.2d 461 (1991).

The Supreme Court has made it clear that persons stopped for any purpose at motorist "checkpoints" set up by government officials on public highways have been seized for Fourth Amendment purposes. *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); *United States v. Martinez–Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In order for a checkpoint seizure to satisfy the constitutional requirements of the Fourth Amendment, it must be reasonable under the circumstances. *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Whether a particular checkpoint seizure is reasonable is deter-

mined by the balancing test established in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). *Sitz*, 496 U.S. at 450, 110 S.Ct. 2481. The test weighs the "gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas*, 443 U.S. at 50–51, 99 S.Ct. 2637. In considering the severity of the intrusion on individual liberty, the court must consider both the objective intrusion of the seizure—the duration of the stop and the intensity of any brief questioning and visual inspection that might attend it—and its subjective intrusion—its potential for generating fear and surprise to law-abiding motorists. *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481. As explained by the Court in *Brown v. Texas*, the purpose in weighing these three factors is to "assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." 443 U.S. at 51, 99 S.Ct. 2637.

Applying this balancing analysis, the Supreme Court has upheld the constitutionality of government checkpoints set up to detect drunken drivers, *Sitz*, 496 U.S. at 444, 110 S.Ct. 2481, and illegal immigrants, *Martinez-Fuerte*, 428 U.S. at 543, 96 S.Ct. 3074, as long as they involve no more than an "initial stop . . . and the associated preliminary questioning and observation by checkpoint officers." *Sitz*, 496 U.S. at 450–51, 110 S.Ct. 2481. In concluding that these checkpoint stops do not violate the Fourth Amendment even though the officers do not have probable cause or a warrant for the seizure, the Supreme Court has focused on the lack of discretion afforded the individual officers, the standardized procedures employed, and the minimal intrusion imposed on motorists. *Id.* at 453–54, 110 S.Ct. 2481.

### A.

■ A problem arises in the present case in regard to the first factor of the *Brown v. Texas* test—the gravity of the public concern served by the seizure—because the parties contest the government purpose the Airport Road checkpoint was intended to further. The United States contends it was established primarily to eradicate drunken driving, whereas defendants argue the roadblock's primary purpose was to detect narcotics. After an evidentiary hearing to address this issue, the district court found substantial evidence supported the conclusion that the primary purpose of the roadblock was to detect narcotics. However, because the court found that a secondary purpose of the roadblock was to detect drunken drivers, a purpose previously sanctioned by the Supreme Court in *Sitz*, the court held that the legitimacy of the roadblock could be sustained.

The district court relied on the United States Court of Appeals for the Eleventh Circuit's decision in *Merrett v. Moore*, 58 F.3d 1547 (11th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 58, 136 L.Ed.2d 21 (1996), in concluding that a "mixed-motive" or pretextual roadblock is constitutional if the state has one lawful purpose sufficient to justify the roadblock, but also uses the roadblock to intercept illegal drugs. In *Merrett,* the Florida Department of Law Enforcement ("FDLE"), in an effort to locate illegal drugs, proposed establishing highway checkpoints to stop all cars and subject the vehicles to narcotic sniffing dogs. Because the FDLE had no authority to set up roadblocks, it asked the Florida Highway patrol ("FHP") to establish driver's license checkpoints. *Id.* at 1549. According to the plan between the FDLE and the FHP, FHP officers would stop vehicles at the checkpoint, check for obvious safety defects, and review driver's licenses and registrations. While each vehicle was stopped, dog handlers would escort a K–9 narcotics detection dog to the vehicle where the dog would sniff for the presence of narcotics. If a dog alerted to the presence of narcotics, a second dog checked the outside of the car. If the second dog alerted, the driver was asked to consent to a search of the vehicle, and if consent was refused, the driver was detained until officers obtained a search warrant. *Id.* During a two-day operation involving four different sites, 2100 vehicles passed through the checkpoints. Of the 1330 vehicles that were stopped, only one arrest was made for the possession of narcotics. *Id.*

In *Merrett*, a group of motorists who were stopped at the roadblocks brought suit against the officials involved, alleging that the checkpoints violated their Fourth and Fourteenth Amendment rights. *Id.* at 1549–50. In the plaintiffs' appeal from the district court's dismissal of their constitutional claims, the Eleventh Circuit first addressed the plaintiffs' argument that because the roadblock operation was conducted for the purpose of narcotics detection, it constituted an unconstitutional pretextual seizure. The court disagreed and in the following passage explained why:

> That the chief (but not sole) purpose of the roadblocks in this case was to intercept drugs is undisputed. That the state had the authority to conduct roadblocks to check drivers' license and vehicle registration is also undisputed. We conclude that, where the state has one lawful purpose sufficient to justify a roadblock, that the state also uses the roadblock to intercept illegal drugs does not render the roadblock unconstitutional. In other words, we adopt a totally objective rule: a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock, even if no roadblock would have been put in place but for the state's desire to hunt for unlawful drugs.

*Id.* at 1550–51.[4]

Although the Eleventh Circuit in *Merrett* held that mixed-motive checkpoints are lawful as long as at least one of the underlying purposes—no matter how minor—is legitimate, it is the only court of appeals that has done so, and we do not agree with its reasoning. Heretofore, federal courts have allowed very few exceptions to the Fourth Amendment requirement that law enforcement officers must possess at least articulable suspicion before stopping a vehicle: namely, at fixed checkpoints near border crossings to preclude illegal immigration, *Martinez–*

*Fuerte*, 428 U.S. at 566–67, 96 S.Ct. 3074, and at fixed and temporary checkpoints to ensure compliance with traffic-related laws, such as driver's license, vehicle registration, and drunk driving laws. *Sitz*, 496 U.S. at 455, 110 S.Ct. 2481; *United States v. McFayden*, 865 F.2d 1306, 1313 (D.C.Cir.1989). *Merrett* and the present case, however, present the issue of whether a roadblock established under the pretext of ensuring compliance with traffic-related laws, but actually designed to intercept illegal drugs, is unreasonable and therefore unconstitutional. As the dissent in the denial of the Petition for Rehearing En Banc in *Merrett* pointed out:

> During prohibition seventy years ago, the Supreme Court observed that "[i]t would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor...." *Carroll v. United States*, 267 U.S. 132, 153–54, 45 S.Ct. 280, 69 L.Ed. 543 (1925) (emphasis added).... [P]ermitting enforcement officers to stop every vehicle at a roadblock based on the mere possibility that one or more of the vehicles passing through will contain illegal drugs—evidence of a crime completely unrelated to highway safety—is similarly intolerable and unreasonable.

77 F.3d 1304, 1305 (11th Cir.1996). When a roadblock is set up as a pretext, the reasonableness of the roadblock seizure can be determined under the balancing test of *Brown v. Texas* without giving any consideration to the roadblock's primary purpose—the interception of illegal drugs. 77 F.3d at 1305–06. For example, in *Merrett*, the court ignored the actual purpose and effectiveness of the roadblock in regard to detecting narcotics, but found instead that in regard to the ostensible purpose to check driver's licenses, there was a 4.6 percent citation rate for license registration defects. 58 F.3d at 1549. However, in regard to the effectiveness of the actual purpose, only one arrest for narcotics

---

4. After holding that a "mixed-motive" roadblock can be constitutional, the court concluded that the roadblocks in *Merrett* satisfied the balancing analysis because, with the exception of one motorist who was delayed significantly longer than necessary and told he could not turn around and avoid the roadblock, the roadblocks yielded a

4.6% citation rate for license and registration defects, and motorists experienced only slight delays. *Id.* at 1551–52. The court also noted that use of the drug dog took no longer than the time needed to complete a simple license and registration check. *Id.* at 1549.

was made out of 1,330 vehicles stopped, a fact ignored by the *Merrett* court.

Moreover, although the Supreme Court has not directly considered the issue of pretextual checkpoints used for narcotics detection, it has indicated in dicta that this type of roadblock would be unreasonable.[5] In *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the Court reviewed a decision in which a court suppressed evidence seized at a roadblock on the ground that the officer had to change his position in order to see the evidence, allegedly rendering the plain-view doctrine inapplicable. *Id.* at 734–35, 103 S.Ct. 1535. The Court found that the plainview doctrine did apply, emphasizing that there was "no suggestion that the roadblock was a pretext whereby evidence of [a] narcotics violation might be uncovered in 'plain view' in the course of a check for driver's licenses." *Id.* at 743, 103 S.Ct. 1535. In *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Court upheld an inventory search because "there is no suggestion whatever that this standard procedure ... was a pretext concealing an investigatory police motive." The Supreme Court has thus "repeatedly emphasized the importance of keeping criminal investigatory motives from coloring administrative searches." *United States v. $124,570 U.S. Currency*, 873 F.2d 1240, 1244 (9th Cir.1989).

No other court of appeals has agreed with the *Merrett* analysis and instead has upheld the constitutionality of a challenged checkpoint only if its primary purpose is lawful. When considering a roadblock nearly identical to the ones in *Merrett*, the Court of Appeals for the Tenth Circuit in *United States v. Morales–Zamora*, 974 F.2d 149 (10th Cir.1992), found the roadblock violated the Fourth Amendment. The court explained "[i]t would seem to follow that had the roadblock [in *Texas v. Brown* ], which was designed to check for driver's licenses and registration, been but a pretext to look for 'plain view' evidence of more serious crimes, the seizure of the [evidence] would have constituted a violation under the Fourth Amendment." *Id.* at 152. The court concluded that the primary reason for the roadblock stop of Zamora's car was not to check her driver's license, but to ascertain, with the aid of an ever-present sniffing canine, whether she possessed drugs. The court stated, "it follows that the stop was pretextual and all that occurred thereafter was tainted." *Id.* at 153. *See also McFayden*, 865 F.2d at 1312 (holding "principal purpose of the roadblock was [legitimate]", but noting the possibility that if a roadblock erected for purportedly legitimate reasons were used for unlawful purposes, this could lead to "a subterfuge [that] might result in an infringement on Fourth Amendment rights.... ").

We agree with these courts, because, in our view, a pretextual roadblock has pitfalls that come perilously close to permitting unfettered government intrusion on the privacy interests of all motorists. As the Supreme Court has observed:

Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental in-

---

**5.** There is a related line of cases regarding pretextual traffic stops, not occurring at checkpoints. *See, e.g. Whren*, 517 U.S. at 810, 116 S.Ct. 1769; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (en banc), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994). Under these cases, a police officer may lawfully stop a vehicle, regardless of his underlying motive, as long as he has probable cause to believe that a traffic violation occurred. Thus, a police officer, who suspects that a motorist is transporting drugs, may follow the motorist until he breaks any minor traffic rule and may pull him over under the pretext of enforcing that minor traffic rule. Any contraband discovered during that traffic stop will be deemed to have been found lawfully.

The holdings of these cases, however, are not directly applicable here. They apply in cases where an officer has singled out one car from the many that may be on the road, and the officer is not stopping every motorist who drives by, which is what occurs at a checkpoint. Furthermore, the officer is authorized to pull over only those drivers who are in *violation of a traffic law.*

trusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed.

*Delaware v. Prouse*, 440 U.S. 648, 662–63, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). We believe that the danger inherent in pretextual roadblocks is the potential for giving police the authority to stop every car on the road, question its driver and passengers under the guise of a legitimate traffic-related purpose, and then claim enough reasonable suspicion through, for example, the driver's expression or answers, to conduct a more thorough search of the stopped individuals and vehicles for drugs with insufficient limitations on police discretion.[6] We believe the Fourth Amendment requires that police deception and subterfuge must be carefully scrutinized in regard to pretextual checkpoints, as checkpoints constitute an exception to the Fourth Amendment's requirement for a warrant and probable cause. *See Martinez–Fuerte*, 428 U.S. at 556–57, 96 S.Ct. 3074. For this reason, we believe in the present case, we must determine the actual purpose of the Airport Road checkpoint, because we find it does not necessarily pass constitutional muster simply because one of its alleged purposes was to detect intoxicated drivers, a purpose previously approved by the Supreme Court in *Sitz*, 496 U.S. at 451, 110 S.Ct. 2481.

### B.

■ In determining the primary purpose of the Airport Road checkpoint, we find that it was to detect narcotics. Although Officer Worley and the Roane County Sheriff's Department claim that the primary purpose of the challenged checkpoint was to detect intoxicated drivers, their actions speak louder than their words. The signs on the highway warn of a "Drug–DUI" checkpoint; the checkpoints are supervised by the county's Narcotics Officer; a D.A.R.E. vehicle and Narcotics Officer are present at each of the checkpoints; and any proceeds from resulting forfeitures are returned to the county's drug fund. The expense of setting up and operating the checkpoints is funded entirely from drug interdiction activity. Furthermore, the officers operating the checkpoints are not properly prepared to participate in DUI detection. Only one officer—the Narcotics Officer—had ever been formally trained in DUI detection. The officer who first approached defendants had never received DUI detection training. Although a drug dog is present during every operation of the checkpoint, no breathalyzer has ever been present. Although the Roane County "Policy and Procedure for Setting Up Sobriety Check Point" memorandum specifically requires that a Breath Alcohol Test be administered to suspected intoxicated drivers, it is impossible to give this test because of the lack of equipment and training. In the present case, rather than asking questions relevant to intoxication, the officers asked defendants why they had left the Interstate at this particular exit, an intrusive query unrelated to sobriety.

Finally, the checkpoint is almost always operated during daylight hours. Although Officer Worley claimed that the department is no more likely to encounter intoxicated drivers after twilight, common sense indicates more people drink in the evenings. Moreover, the record indicates that the real DUI checkpoints that Worley set up were at night. During the year before defendants' arrests, the Airport Road checkpoint operated on approximately 64 different days and

---

**6.** For example, the dissent in *United States v. Soyland*, 3 F.3d 1312, 1315 (9th Cir.1993) (Kozinski, J., dissenting), *cert. dismissed,* —— U.S. ——, 115 S.Ct. 32, 129 L.Ed.2d 928 (1994), hypothesized as follows:

Suppose the California Highway Patrol ["CHP"]and the DEA hatch a plan to use drunk-driving checkpoints in the war against drugs: CHP officers agree to set up the checkpoints at freeway entrances the DEA believes are frequented by drug couriers, and the DEA gives the CHP officers drug courier profiles and trains them to scan drivers and passengers. Suppose there is also a tacit understanding that, in making the highly discretionary decision about whom to pull over and test, CHP officers consider whether anyone in the car fits a DEA profile, whether the car is popular with drug dealers, and a variety of other factors that point to drug dealing. While these sobriety stops might look exactly like those approved in *Sitz*, the effort to use them for unrelated law enforcement purposes would fatally undermine the Supreme Court's rationale·in that case.

approximately 2,342 cars were stopped. There were only seven arrests for DUI to further the purported goal of detecting intoxicated drivers. During the same period, however, 128 arrests were made for drug-related offenses. For these reasons, we conclude that the checkpoint was not operated for the ostensible purpose of detecting intoxicated drivers, but as a pretext to stop drivers who had violated no traffic laws in order to question them in an attempt to gain reasonable suspicion to search their cars for narcotics.

### C.

■ We do not believe that under the balancing test established in *Brown v. Texas*, the gravity of the public concern about drug trafficking outweighs the severity of the interference with individual liberty for the following reasons.[7] Considering this factor, the Supreme Court in *Martinez–Fuerte* in the following passage explained why the checkpoints at issue were not unduly intrusive:

> First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abu-

> sive or harassing stops of individuals than there was in the case of roving-patrol stops.

428 U.S. at 559, 96 S.Ct. 3074.

Thus, in *Martinez–Fuerte*, the objective and subjective intrusion to a motorist's Fourth Amendment right to be free from unreasonable searches and seizures was slight. In contrast, in the present case, motorists exiting off the Airport Road exit are taken by surprise; they are stopped "elsewhere," not at the designated location for the checkpoint; checkpoint operations involve discretionary enforcement activity depending on which officer stops the vehicle and on whether a motorist has in-state or out-of-state license plate tags; the location of the checkpoint is chosen by an officer in the field, the checkpoint operates as a trap and bears arbitrarily and oppressively on those who take the Airport Road exit; and there is room for abusive and harassing questioning, which is left to the discretion of the individual officer in the field.

One of the problems with evaluating a checkpoint that is set up as a pretext is that the ostensible guidelines for its operation do not reflect its actual operation. For example, in the present case, the memorandum for setting up sobriety checkpoints provided that checkpoints would be set up only at the direction of high level administrative officials. Instead, the checkpoints were set up at the discretion of Officer Worley, an officer in the field. The procedures also specified that if the driver failed a field sobriety test, an officer must offer the driver a breath/alcohol test. The evidence established that the Roane County Sheriff's Department owned an Intoximeter 3000. However, in direct contravention to the county's policy, Worley never had a breathalyzer machine at any of the 65 Airport Road checkpoints. There were no guidelines on how to operate the ruse, what questions were to be asked, or how to use the drug dog present, which was left completely to Officer Worley's discretion. "The essential purpose of the proscription in

---

7. We are not able to assess "the degree to which the seizure advances the public interest," *Brown v. Texas*, 443 U.S. at 50–51, 99 S.Ct. 2637, because although 128 arrests were made for drug-related offenses, the government did not introduce any evidence that any of these arrests resulted in convictions.

the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order to 'safeguard the privacy and security of individuals against arbitrary invasions.'" *Delaware v. Prouse,* 440 U.S. at 653–54, 99 S.Ct. 1391 (quoting *Marshall v. Barlow's Inc.,* 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978)). We believe the line against arbitrary invasions has been crossed in the present case. The evidence indicates that when the purpose of a checkpoint is pretextual, the guidelines set up for its ostensible operation are not truthful and are not followed, and too large a degree of discretion is left to the officer in the field on the operation of the subterfuge.

We disagree with the district court's conclusion that our opinion in *United States v. Ferguson,* 8 F.3d at 385, indicates that a mixed-motive pretextual stop at a checkpoint is constitutional even if there is no traffic violation. In *Ferguson,* an officer stopped the vehicle in which the defendant was a passenger after observing the car lacked a license plate. The officer also suspected that the vehicle was involved in drug trafficking. *Id.* at 386–87. In addressing the defendants' argument that the stop was pretextual, we held that "so long as the officer has *probable cause* to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful." *Id.* at 391 (emphasis added). The test we adopted in *Ferguson* "focus[es] on ... whether [the] particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *Id.*

We believe the district court in the present case erred in concluding that because this court upheld in *Ferguson* a pretextual stop in the *presence* of probable cause for a traffic violation, this court would therefore find a pretextual roadblock constitutional in spite of the *absence* of probable cause that a traffic violation had occurred. As the Supreme Court emphasized recently in *Whren v. United States,* 517 U.S. at 816, 116 S.Ct. 1769, there is a significant difference between a pretextual stop based on probable cause that

a traffic violation has occurred, and a stop that is not based on probable cause or even reasonable suspicion. The Court in *Whren* held that a motorist may be constitutionally stopped upon probable cause that the motorist has violated a traffic law regardless of the officer's subjective intent to stop the motorist upon suspicion of drug trafficking. The Supreme Court found that "[s]ubjective intentions play no role in ordinary, *probable-cause* Fourth Amendment analysis." *Id.* at 813, 116 S.Ct. 1769 (emphasis added). The Supreme Court emphasized, however, the distinction between its holding in *Whren* and cases involving police intrusion without the probable cause that is the traditional justification for a seizure. The Court indicated its pretext analysis would not apply to such cases, which lack the "'quantum of individualized suspicion' necessary to ensure that police discretion is sufficiently contained." *Id.* at 817, 116 S.Ct. 1769 (quoting *Prouse,* 440 U.S. at 654–55, 99 S.Ct. 1391). The Supreme Court in *Whren,* thus, made clear that pretext (the subjective motive for stopping a vehicle) is irrelevant when probable cause exists, but in regard to seizures made without probable cause, or even reasonable suspicion, there is no justification for pretext.

For these reasons, we believe that in the present case, the ramifications of a pretextual purpose poses a definite threat to the Fourth Amendment not found in cases, such as *Ferguson,* in which there is probable cause to stop the vehicle for a traffic violation. At a checkpoint, every single person is stopped, not just those persons who have violated a traffic law. Thus, a driver, who has violated no traffic law, whom an officer could not stop for a pretextual purpose away from the checkpoint, *Whren,* 517 U.S. at 816, 116 S.Ct. 1769, may be subjected to a pretextual stop merely for choosing to travel the road on which a checkpoint has been erected. The problem with mixed-motive checkpoints is that they allow law enforcement officers the opportunity to use a pretext to question and search for contraband without probable cause, conduct the Supreme Court consistently has frowned upon. *See Texas v. Brown,* 460 U.S. at 734–35, 103 S.Ct. 1535; *South Dakota v. Opperman,* 428 U.S. at 376, 96 S.Ct. 3092.

■ Also, we do not agree with the district court's attempt to distinguish this case from our holding in *United States v. Mesa*, 62 F.3d 159 (6th Cir.1995), in which this court stated that mere nervousness of the driver was not "in and of itself" sufficient to provide reasonable suspicion for a search. *Id.* at 162. The district court indicated that the present case is distinguishable from *Mesa* because there was a verifiable falsehood when defendants Martin and Huguenin lied about their reason for exiting at Airport Road to get gas as their gas gauge was full. The district court failed to see, however, that there was no justifiable reason in relation to intoxication for questioning defendants about their reasons for taking the Airport Road exit.[8]

For these reasons, we disagree with the district court that although the primary purpose of the Airport Road checkpoint was to detect narcotics, the search and seizure could be upheld because one purpose of the roadblock was to detect drunken drivers, since a DUI checkpoint had been sustained in *Sitz*. We decline to follow the Eleventh Circuit's approach in *Merrett* which allows law enforcement to conduct a mixed-motive roadblock as long as one purpose presented for the roadblock can validly justify its use and meet the requirements of the *Brown v. Texas* test.[9]

■ Moreover, in the present case, even if the planned operation of the checkpoint, in general, was not pretextual, its operation during the detention of defendants was pretextual. The officers that approached defendants' van did not ask them about drinking or otherwise engage defendants in activities to determine if they were driving under the influence. Instead, Officer Brock noted almost immediately that defendants did not appear to be intoxicated. Rather than let defendants proceed, however, the officers began asking them about their plans, destination, and purpose for taking the exit ramp. Once the officers recognized that defendants were not intoxicated, none of these questions would serve the checkpoint's purported legitimate purpose. The questions served only to detain defendants long enough for the officers to develop reasons to conduct a more thorough search by their intrusive questioning. If the county had truly established the checkpoint for the purpose of detecting intoxicated drivers, defendants should have been released as soon as the first officer to approach them was satisfied that they were not intoxicated after approximately fifteen to twenty seconds; defendants should not have been questioned by two different officers for several minutes about their reasons for using the exit, which is totally unrelated to intoxication. *Maxwell v. City of New York*, 102 F.3d 664, 667 (2nd Cir.1996) (finding objective intrusion slight when detention was brief and questions were "aimed solely at ascertaining" information related to the checkpoint's legitimate purpose), *cert. denied*, —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997).

To conclude, we do not believe the need to curtail drug trafficking outweighs the intrusion on individual liberty that occurred. We find that, without a traffic violation or reasonable suspicion of drug trafficking, it was a violation of the Fourth Amendment for the police to selectively detain motorists with out-of-state tags who took the Airport Road exit to question them about their travel plans in order to assess whether they were engaged in drug trafficking. Rather than establishing a neutral procedure applicable to all motorists, the officers set up a trap aimed

---

**8.** Since the Supreme Court's decision in *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), it has been clear that the limited exception to the individualized suspicion requirement that justifies temporary seizures of motorists at properly operating checkpoints does not serve also to allow searches of motorists, persons, or effects.

**9.** Moreover, this case is distinguishable from *Merrett*. Whereas in *Merrett* there were procedures for checking for license registration (the alleged legitimate purpose of the roadblock), in the present case, the officers did not have a proper procedure for screening motorists for intoxication. Thus, there is insufficient evidence that the Airport Road checkpoint could even be justified as a legitimate DUI checkpoint. Moreover, in *Merrett*, the motorists were detained no longer than the time required to conduct a driver's license and registration check. In contrast, in the present case, defendants were stopped and questioned about their travel plans for several minutes, which had no relation to intoxication.

at motorists who took the Airport Road exit, a trap which they believed then gave them the right to ask intrusive and harassing questions about travel plans. We believe this pretextual seizure invokes the "kind of standardless and unconstrained discretion [that] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Delaware v. Prouse,* 440 U.S. at 661, 99 S.Ct. 1391. We find that the Airport Road checkpoint was established as a pretext with the primary purpose of intercepting illegal drugs and not for the ostensible purpose of detecting intoxicated drivers.[10] Although the prevention of drug trafficking is an important government interest, we do not believe it warrants this type of pretext when there is no traffic violation, no probable cause, and not even reasonable suspicion to otherwise stop the vehicle, because the severity of interference with individual liberty is too great.

### III.

■ In the alternative, we find that even if the checkpoint had as its primary purpose the detection of intoxicated drivers, the procedure used was unreasonable under the balancing test established in *Brown v. Texas.* As previously stated, to determine whether a roadway checkpoint is reasonable, the reviewing court must weigh three factors: 1) the importance of the government interest involved; 2) the effectiveness of the checkpoint in meeting the government's goal; and 3) the severity of the intrusion on the individual's Fourth Amendment rights. 443 U.S. at 50–51, 99 S.Ct. 2637.

As established by *Sitz,* the alleged purpose of the Airport Road checkpoint, the detection of intoxicated drivers, clearly satisfies the first factor—the gravity of the public concern. 496 U.S. at 451, 110 S.Ct. 2481. In reviewing the checkpoint's effectiveness to determine whether the public interest in eradicating drunken driving is furthered, we find that of the approximately 2,342 vehicles that were stopped, seven arrests were made for DUI, yielding a .29% level of effectiveness. This percentage is significantly lower than the 1.6% approved of in *Sitz.*[11] *Id.* at 455, 110 S.Ct. 2481.

In regard to the third factor—the severity of the intrusion on Fourth Amendment rights—it should be noted that in *Sitz* the Supreme Court emphasized the importance of having proper guidelines to effectuate that purpose of detecting and deterring intoxicated drivers without undue police discretion. 496 U.S. at 450–53, 110 S.Ct. 2481. In *Sitz,* the director of the Michigan Department of State Police appointed a Sobriety Checkpoint Advisory Committee comprised of members of the State Police force, local police forces, state prosecutors, and the University of Michigan Transportation Research Institute. This committee created guidelines which set forth the procedures governing the site selection, operations, and publicity of sobriety checkpoints. *Id.* at 447, 110 S.Ct. 2481. According to the guidelines, all vehicles approaching the checkpoint would be stopped, and the drivers would be briefly questioned in order to determine whether the drivers displayed signs of intoxication. If the driver did not display any indicators of intoxication, the driver was permitted to pass through the checkpoint immediately. The stops lasted approximately 25 seconds and ended as soon as officers determined that the driver had no signs of intoxication. *Id.* at 447–48, 110 S.Ct. 2481. The Supreme Court noted that the objective intrusion inflicted on innocent drivers was no more invasive than that which it

---

**10.** We agree with the Tenth Circuit in *Morales–Zamora* that in regard to checkpoints:

[A] pretextual stop occurs when the police use a legal justification to make a stop . . . in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop. 974 F.2d at 152.

**11.** It is also lower than the .5% in *Martinez–Fuerte.* However, it is questionable whether a helpful comparison can be made to *Martinez–Fuerte.* The .5% is based on the "ratio of illegal aliens detected to vehicles stopped (considering that on occasion two or more illegal aliens were found in a single vehicle)." *Sitz,* 496 U.S. at 455, 110 S.Ct. 2481. The Court also referred to a .12 percentage, which was the calculation of the number of illegal aliens found in vehicles passing through the checkpoint. *Id.*

had already upheld in *Martinez–Fuerte. Id.* at 452, 110 S.Ct. 2481.

The Court in *Sitz* also found that the subjective intrusion was slight, because approaching motorists could see that every vehicle was being stopped and there were visible signs of the officers' authority. *Id.* at 453, 110 S.Ct. 2481. The Court clarified that while courts are to consider the potential checkpoints have in generating "fear and surprise," "the 'fear and surprise' to be considered are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." *Id.* at 452, 110 S.Ct. 2481.

In reviewing the degree of intrusion at the *Martinez–Fuerte* checkpoints, the Supreme Court emphasized the lack of discretion allocated to the operating officers, the brief duration of the stop in which just a few questions were asked and perhaps a document reviewed, and the numerous physical and visual indicators apparent to approaching motorists. 428 U.S. at 558–59, 96 S.Ct. 3074. The challenged checkpoints were permanent structures with flashing lights and signs saying "STOP HERE—U.S. OFFICERS," cones funneling cars into appropriate lanes, uniformed border patrol officers directing traffic, and parked marked border patrol cars with activated lights. *Id.* at 546, 96 S.Ct. 3074. The Supreme Court emphasized that these indicators would inform approaching motorists that the stop was authorized and non-random, thereby lessening the potential for fear and surprise. *Id.* at 559, 96 S.Ct. 3074. *See also United States v. Trevino,* 60 F.3d 333, 337 (7th Cir.1995) (checkpoint was "set up in a manner which informs incoming motorists that this is an official stop ... conducted ... in a regular manner, applicable to all motorists"), *cert. denied,* 516 U.S. 1061, 116 S.Ct. 739, 133 L.Ed.2d 689 (1996); *Brouhard v. Lee,* 125 F.3d 656, 660 (8th Cir.1997) (when approaching motorists can see that all traffic is being stopped, the public is "much less likely to be frightened or annoyed by the intrusion").

We do not believe the safeguards indicated in *Sitz* and *Martinez–Fuerte* are sufficiently established in the present case. In regard to the objective intrusion, defendants' initial detention lasted for at least several minutes. Although that is not, objectively, a long period of time, it is a great deal longer than the initial detentions of less than half of a minute that were upheld in *Sitz* or *Martinez–Fuerte*. Furthermore, as Officer Worley testified, it usually takes only 10 to 15 seconds "at the most" to determine whether a driver is operating a vehicle under the influence of alcohol. Instead, in the present case, defendants were questioned twice by two different officers with inquiries designed not to determine whether the driver was intoxicated, but to discover where defendants had been and where they were headed, implying a suspicion that the car contained contraband. Thus, defendants were subjected to questioning involving more than a few brief queries necessary to effectuate the alleged purpose of the checkpoint, and the scope of the questioning was not "aimed solely at ascertaining" whether Mr. Martin was intoxicated. *Maxwell,* 102 F.3d at 667. As stated previously, there is no justification for questions about travel plans in order to determine one's sobriety. *Brouhard,* 125 F.3d at 660 (no evidence officers enjoyed undue discretion by asking questions unrelated to determining whether drivers were intoxicated). For these reasons, we find the objective intrusion into defendants' privacy was not limited by appropriate operating procedures, but was unnecessarily high due to the lack of limitations on the officers' discretion. As the Supreme Court stated in *Martinez–Fuerte,* "The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." 428 U.S. at 566–67, 96 S.Ct. 3074.

We also find that the Airport Road checkpoint was more subjectively intrusive than others previously upheld. In considering the "fear and surprise engendered in law-abiding motorists" by the nature of the stop, *Sitz,* 496 U.S. at 452, 110 S.Ct. 2481, this fear and surprise is heightened if motorists perceive that they are being singled out by random, roving-patrol stops, which frequently take place on seldom-traveled roads. *Id.* at 452–53, 110 S.Ct. 2481. The fear and

surprise is decreased if the stops are operated in a regularized manner, and if they "appear to and actually involve less discretionary enforcement activity." *Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. 3074. When the motorist can "see that other vehicles are being stopped [and] can see visible signs of the officer's authority, ... he is much less likely to be frightened or annoyed by the intrusion." *Id.* at 558, 96 S.Ct. 3074 (quoting *United States v. Ortiz,* 422 U.S. at 894–95, 95 S.Ct. 2585).

A review of these standards indicates that the Airport Road checkpoint was more akin to a roving patrol stop than to a sobriety checkpoint because it was set up as a trap, which most likely created fear and surprise in law-abiding motorists. Only those people who safely and legally exited the Interstate before the announced checkpoint were stopped. The exit ramp is in a secluded area where few people exit, and there is no notice to the motorist about what is taking place at the exit. Furthermore, there is no procedure for how the vehicle is to be approached. In defendants' case, Officer Brock "just happened to be there when they came up" and stepped in front of their car. Thus, the procedure did not treat motorists on a non-random basis, but singled out motorists, who, for whatever reason, chose to take the Airport Road exit. Although the officers at the checkpoint were in uniform and near marked cars and cones, we are concerned with the lack of indicators as motorists approached the checkpoint. While most of the checkpoints approved by other courts had a series or sets of lights and/or signs, this checkpoint had only one set of signs on the highway. However, the checkpoint was not on the main highway where the signs were, but was at the end of a discretionary exit ramp, hidden until the last possible moment. Rather than setting up the checkpoint in a high traffic area very visible to the public, the Airport

Road checkpoint was in a secluded area where it is common for long periods of time (more than half an hour) to pass without a single car getting off the exit.[12] Moreover, there was no way for a motorist to recognize when he was approaching the checkpoint until the last minute, and nothing to indicate that it was applicable to all drivers.[13] There were no visible signs of the officers' authority, due to the slope and angle of the exit, until 50 to 100 yards into the exit. Significantly, on the day defendants were stopped, no sign was posted at the exit informing motorists of the upcoming checkpoint.

When asked whether the purpose of placing the "Drug–DUI Enforcement Checkpoint 1/2 mile ahead" sign on the freeway was to fool people into getting off at the exit, Officer Worley conceded, "[i]t could be, yes." Thus, while checkpoints must stop motorists on a non-random and neutral basis, in the present case the checkpoint was intentionally set up as a trap, targeting motorists who left the Interstate and who thought they would avoid the highway checkpoint for whatever reason.[14] By using such a ruse and hiding the checkpoint, the Roane County officers did not attempt to minimize the fear and surprise potentially experienced by motorists, but specifically attempted to increase the surprise. An ordinary law-abiding citizen, who perhaps took the exit simply to avoid the unusual process of being stopped on an Interstate highway, could fear that he would be under greater suspicion and subject to more intrusive questions and a thorough search of his car simply because he had chosen to take the exit. We, therefore, find that from the point of view of a law-abiding motorist, the fear and surprise engendered by the stop was substantial.

■ Addressing the discretion left to the officers in the field, the Supreme Court, in

---

**12.** For example, when defendants took the Airport Road exit, their car was the only one there. We do not mean to imply that the legality of the checkpoint depends on the number of cars stopped at the same time. However, we question a checkpoint consciously chosen because it is in a secluded area. If the roadblock's primary purpose was really to detect intoxicated drivers, its location made no sense.

**13.** In fact, the checkpoint was not applicable to all drivers. Cars entering the Interstate from Airport Road were not stopped.

**14.** Since 2,342 vehicles passed through the checkpoint and only 135 arrests were made, most motorists were law abiding and had a legitimate reason for using the exit.

upholding the checkpoints in *Sitz*, emphasized that individual discretion was kept to a minimum because the checkpoint was operated under written guidelines setting forth the procedures that would govern the operation of the checkpoint, site selection, and publicity. 496 U.S. at 447, 110 S.Ct. 2481. Although in the present case, the Roane County Sheriff's Department had established procedures governing the establishment of sobriety checkpoints, the guidelines do not contain any standards regarding the location of checkpoints or the times they will be conducted. *See McFayden*, 865 F.2d at 1313 (list of possible roadblocks was determined in advance by the District Commander on the basis of community complaints and roadblocks were supervised by non-field officers); *Ortiz*, 422 U.S. at 894, 95 S.Ct. 2585 (location is determined by high-level Border Patrol officials, using criteria including degree of inconvenience to the public and potential for safe operation). The discretion left to the officers in the field is evident by Officer Worley's testimony that, while he seeks approval from the Roane County Sheriff for a given checkpoint, he designates the time and location of the checkpoint, and his requests have never been denied.[15] As previously discussed, there were no guidelines for the actual operation of the checkpoint, and the guidelines for a DUI checkpoint were not followed.[16]

The excessive discretion left in the hands of the officers is further evidenced by the type of questions asked. Instead of asking a sufficient number of standard questions for a period long enough to determine sobriety, Officer Brock testified that he varied his questioning based on whether the approach-

ing vehicle displayed out-of-state or in-state license tags.[17] In the present case, the officers intimated to defendants that the only legitimate reason for using the exit was to obtain services or to find help. The questions were not standardized, and it was left to the discretion of the officer to decide how intimidating he wished to be. Finally, the officers enjoyed excessive discretion in deciding who to turn away. *See Maxwell*, 102 F.3d at 668. Thus, contrary to the checkpoints approved by the Supreme Court in *Martinez–Fuerte* and *Sitz*, the hidden Airport Road roadblock involved a tremendous amount of discretionary enforcement activity likely to engender fear and surprise in law-abiding motorists. *Trevino*, 60 F.3d at 337 (critical factors in determining subjective intrusiveness are whether checkpoint is set up in manner that informs incoming motorists that checkpoint is official stop and whether officers conducting stop are given unbridled discretion to randomly target individual motorists).

Although the Supreme Court has upheld the use of suspicionless roadblocks to conduct sobriety or immigration checkpoints, the Court has always required that such checkpoints be established according to neutral articulable standards, which do not exist in the present case. *Sitz*, 496 U.S. at 447, 110 S.Ct. 2481; *Martinez–Fuerte*, 428 U.S. at 566–67, 96 S.Ct. 3074. In contrast to the checkpoints in *Sitz* and *Martinez–Fuerte*, the officers in the present case had no official guidelines on how to operate the ruse. The checkpoint was not administered according to the policies and procedures established by the Police Department, but by officers in the field, who were free to decide which motor-

15. Although the dissent finds there is no reason the sheriff should not rely on the recommendations of his subordinates for the location of checkpoints, we note that Officer Whorley offered no rationale for the location of the checkpoint which would further the ostensible purpose of detecting intoxicated drivers. Moreover, in *Martinez–Fuerte*, the Supreme Court stressed that the checkpoint locations were *not* chosen by an officer in the field, but by officers responsible for overall decision-making, who could determine the most appropriate locations. 428 U.S. at 559, 96 S.Ct. 3074.

16. For example, the guidelines do not authorize the type of roadblock utilized at Airport Road for they instruct that "[i]f an approaching driver turns off or makes a U-turn in a safe manner, no action will be taken against him." The "trap" on Airport Road was set up in such a way that motorists could not avoid an encounter.

17. Brock not only lacked DUI training, but also made absolutely no inquiry regarding intoxication and made no attempt to smell the defendants' breath. The lack of standardized questions regarding intoxication is further evidence that the checkpoint was not set up as a legitimate DUI checkpoint.

ists would be detained for more extensive questioning and which would not. It was left to their discretion to decide what type of questions would be asked with no limit on invasion of privacy interests. Although Brock testified that he only questioned persons with out-of-state tags more extensively, the potential for randomly targeting individual motorists was great. As the court in *United States v. Walker*, 941 F.2d 1086 (10th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992), indicated, the lack of any constraint on an officer's decision to detain some individuals and to let others go is a situation that is "ripe for abuse." *Id.* at 1089. The court in *Walker* found that when an officer was apparently free to choose which individuals would be detained, the seizure more closely resembled the type of "roving patrol" denounced by the Supreme Court in *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) than the systematic checkpoints approved in *Walker*, 941 F.2d at 1088.

We agree. In the present case, the checkpoint was not a brief stop limited to a few questions relevant to sobriety, but one left to the discretion of the individual officer to be as intimidating and intrusive as he wanted. We believe it is this type of interrogation and intimidation that the Supreme Court was concerned about when it stressed the dangers of unfettered discretion and the need for orderly procedures in its prior holdings. As former Chief Justice Burger wrote in *Brown v. Texas:*

> To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out **pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.**

443 U.S. at 51, 99 S.Ct. 2637 (emphasis added). We are concerned in the present case with the lack of orderly procedures to limit the "unfettered discretion of officers in the field" and with the "arbitrary invasion" of motorists' privacy interests. *Id.*

For these reasons, we find that the importance of the government interest in detecting intoxicated drivers and slight effectiveness in meeting that purported interest must be weighed against a severe degree of intrusion on the motorist's Fourth Amendment rights. We find that because the degree of objective and subjective intrusion was substantial, the checkpoint, even if its primary purpose were to function as a DUI checkpoint, was unreasonable under the balancing test set forth in *Brown v. Texas.*

## IV.

We conclude that the checkpoint at issue in the present case did not effectively serve a government purpose which outweighed its intrusiveness, and therefore was unreasonable under the Fourth Amendment. We hereby **REVERSE** the district court's denial of defendants' joint motion to suppress evidence and **REMAND** for proceedings consistent with this opinion.

KENNEDY, Circuit Judge, dissenting.

Because I believe that the District Court's finding that the checkpoint was a mixed-motive checkpoint, established for the dual purpose of intercepting both drunk drivers and drug traffickers, is not clearly erroneous, and that such mixed-motive checkpoints are permissible, I agree with the Eleventh Circuit that

> where the state has one lawful purpose sufficient to justify a roadblock, that the state also uses the roadblock to intercept illegal drugs does not render the roadblock unconstitutional. In other words, we adopt a totally objective rule: a state may conduct a mixed-motive roadblock as long as one purpose presented for the roadblock could validly justify the roadblock, even if no roadblock would have been put in place but for the state's desire to hunt for unlawful drugs.

*Merrett v. Moore*, 58 F.3d 1547, 1550–51 (11th Cir.1995).

In its alternative holding in part III of its opinion, the court finds that the procedures used by Roane County, Tennessee were unreasonable under the balancing test estab-

lished under *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), even if mixed-motive checkpoints are permissible. While I can agree that the checkpoint here left something to be desired, I believe it met the essential requirements and would therefore affirm.

The majority does not dispute that the purpose of detection of intoxicated drivers satisfies the first factor, gravity of public concern. Yet, it finds the history of this checkpoint's effectiveness significantly lower than that in *Michigan Department of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). The panel's appraisal of its effectiveness is limited, however, to arrests for drunken driving. The District Court also took into consideration arrests of drivers having open containers of alcohol. If those are included, the percentage is higher than in *Sitz.*

The majority also finds the guidelines established by Roane County inadequate. It finds the checkpoints deficient because, while the plan requires approval of the elected Roane County Sheriff for a given checkpoint, the evidence indicates that the sheriff had invariably approved the locations suggested by his deputy. The sheriff, nonetheless, controlled the decision. I know of no reason he could not rely on recommendations of subordinates. Nor do I believe that the absence of a breathalyzer at the checkpoint is critical. Persons who were believed to be intoxicated after field sobriety tests were taken to the sheriff's office for administration of a breathalyzer test. Furthermore, motorists were ordinarily stopped for less than thirty seconds. While defendants here were stopped for several minutes, this was because of Officer Brock's suspicions. Officer Brock asked defendants, as he did with all out-of-state cars, "what brings you here?" When defendant Martin told Officer Brock it was to get gas and Brock saw that the car's gas gauge registered full, Brock turned the inquiry over to Officer Worley, the more experienced officer. The District Court found that at this point there was a reasonable suspicion to justify further detention. That suspicion was based on a verifiable falsehood that defendant had exited the freeway to purchase gas

when his gas tank was full. This was in addition to the nervousness of the occupants and the conduct of defendant in gripping the wheel and looking straight ahead rather than at the officer to whom he was responding. *See United States v. Moore,* 675 F.2d 802, 808 (6th Cir.1982). The drug dog, which was on the D.A.R.E. wagon then, provided probable cause to search.

The majority finds fault with permitting Brock to question the driver because he did not have training in conducting a field sobriety test. However, field sobriety tests were given only if an officer had some indication that the driver had been drinking. Both officers relied on whether they could smell alcohol for this initial screening. The record indicates Brock was capable of performing that screening.

Lastly, the majority finds that the checkpoint was set up to create fear and surprise on law-abiding motorists in that the notice of checkpoint was on the interstate and they would not realize that they were approaching a checkpoint on this exit road until after they had exited. The District Court found that the cones, the police cars and the fact that all cars were required to stop at the stop sign in all events was sufficient notice that one was not singled out but that all motorists were going through a checkpoint. The majority states, "[t]hus, the procedure did not treat motorists on a non-random basis, but singled out motorists, who, for whatever reason, chose to take the Airport Road exit." However, all persons who *exited* were stopped. While motorists might be surprised that the checkpoint was on the exit and not further along on the freeway, the District Court found, and I agree, that motorists would be sufficiently aware that this was the traffic checkpoint of which they had been notified. I do not believe the legality of the checkpoint depends on whether there are several cars stopped at any one time, as the majority implies. While the use of a ruse by warning of a checkpoint and then placing it on the exit may not seem fair, I do not believe the ruse is sufficient to invalidate this checkpoint.

I find nothing sufficient to reject the balancing done by the District Court and would, therefore, affirm.